McCauley *v.* Building & Saving Association.

(*Knoxville.* October 14, 1896.)

1. BUILDING AND LOAN ASSOCIATIONS. *Usury.*

Loans made by a building and loan association at a uniform premium of thirty per cent., without free and competitive biddings, under and in conformity to a by-law requiring that "no money shall be loaned at a greater premium than thirty per cent. nor less than twenty-nine and seven-eighths per cent.," are made for a fixed premium and infected with usury. (*Post, pp. 422–434.*)

Acts construed: Acts 1875, Ch. 142, Sec. 14; Acts 1893, Ch. 12.

Code construed: §§ 2128, 2129, 2136, 2139 (S.); §§ 1742, 1744, 1751, 1754 (M. & V.).

Cases cited and approved: Patterson *v.* Workingman's B. & L. Association, 14 Lea, 677; 92 Pa., 123; 88 Pa. St., 211–216; 69 Ala., 456; 42 Ohio, 655; 71 N. C., 498.

2. SAME. *Usurious loan set aside, when.*

Usurious loans of a building and loan association will be set aside at any time and before the scheme has been matured, at the suit of the borrower, he being required, in such case, to pay back the money borrowed, with legal interest, after crediting payments already made with proper interest. (*Post, pp. 434–436.*)

Cases cited and approved: 56 Ark., 340; 47 Am. St. Rep., 200; 18 L. R. A., 129.

FROM KNOX.

Appeal from Chancery Court of Knox County. H. B. LINDSAY, Ch.

J. PARKER for McCauley.

H. T. COOPER for Building & Saving Association.

WILKES, J. The original bill was filed to enjoin the sale of a house and lot under a trust deed, executed by complainant and her husband, to secure a debt due to the defendant building association. The Chancellor refused to grant the injunction. The lot was sold and purchased by the City National Bank, which held a second mortgage on the lot, subordinate to that of the association. Complainant thereupon filed a supplemental bill, bringing that bank before the Court, seeking to recover $340.72, claimed to be usury exacted on the loan by the defendant building and saving association, of complainant. On the trial upon the merits, the Chancellor refused any relief, and dismissed complainant's bill, and the complainant appealed and assigned errors. The Court of Chancery Appeals reversed the holding of the Chancellor, and granted the complainant the relief asked, and defendants have appealed to this Court and assigned errors. It appears from the finding of fact by the Court of Chancery Appeals that the complainant was a subscriber to the stock of the defendant company in an aggregate amount of $1,600. She borrowed money from the association, and gave her note therefor for $1,600, bearing interest. She received upon this note $1,120, and the remainder, $480, was claimed by the association as premium or bonus required for the loan. The char-

ter of the company is not in evidence, but the by-laws are; and the Court of Chancery Appeals find that -they contain these provisions:

"The funds of the association, as they accumulate in the treasury, shall be offered and loaned by the board of directors to the best use and application among the stockholders entitled to borrow the same. The number of shares shall be regulated by the board of directors.

"When two or more bids at the same rate of premium are offered, the preference may be given to the borrower whose application has priority of date, or whose property, in the opinion of the committee of examination, appears to be the best security for the loan, other things being equal. Applications for loans may be made to the secretary, at any time before the weekly meeting, accompanied by the necessary papers, who shall note thereon the date of the reception. No money shall be loaned at a greater premium than thirty per cent., nor less than twenty-nine and seven-eighths per cent. The successful applicant at the time of receiving the amount loaned, shall pay a premium of thirty per cent. or amount bid for the same, and shall secure the repayment of said loan, with legal interest, by satisfactory bond or mortgage upon real estate, and interest on all loans taken by stockholders shall be paid weekly from the time of bidding for the same.

"In case the funds of the association shall not be called for by any stockholder furnishing satisfac-

tory security, and should remain unproductive for one month, the board of directors may lend to others than members of the association, provided such loans are secured by a lien on real estate, and, provided further, that such loan shall not be made if as many as two directors object."

There are other provisions regulating the payment of fines, dues, etc., and providing for steps to collect the loans when interest is in arrears for six months. It appears that the purchasing bank had a second mortgage on the property, and that it bought the house and lot under foreclosure of the trust deed, and paid therefor to the association $1,258. The Court of Chancery Appeals find as a fact that the by-laws above copied were in force when the loan was made, and the loan was made to complainant under the operation of the rule and in conformity to it. The contention in this case is narrowed down to the question whether there was usury in this transaction, and whether the premium was a fixed premium, and, if so, whether it made the contract unlawful. It is insisted that it is not a case of fixed premium, and not a case of usury, and not contrary to the laws governing building associations.

The Court of Chancery Appeals find that it is a case of fixed premium; that the margin of one-eighth of one per cent. between the highest and lowest rate is a mere device to evade any trouble arising out of an absolutely fixed premium, and is too small and inconsiderable to be considered, except

as an evidence of an attempt at such evasion. In this we think that Court is correct. This by-law unquestionably fixes a minimum premium of twenty-nine and seven-eighths per cent. and a maximum premium of thirty per cent., and no loan could be made except between these figures, and, as a fact, none was made at less than thirty per cent. It must be held, therefore, that the by-laws of the association fixed a premium on all loans, and that no loans could be made at a premium below the sum fixed as minimum nor above the sum fixed as maximum. In regard to the illegality and usurious character of such provisions in the by-laws of a building association, there are some adjudications in other States, and our own decisions bear upon the principle involved. We are admonished that the question is an important one, and likely to affect many loans and associations that are now in existence, and we have carefully examined the question. We have not the time to consider the origin and history of building associations, but we deem it proper that we should advert to their original design and purpose. Many of our people have become shareholders in such associations. Through them some have been enabled to secure homes and houses that they could not otherwise have secured, and many others have lost their homes by foreclosure sales and burdensome requirements. They have increased in number and grown in wealth until a great portion of the real estate of the country is covered by their mortgages

and the dockets of our Courts are crowded with the settlements of controversies between the companies and their members. In their original conception their object was to enable the poor and those of small means and incomes to acquire homes and build houses, and thus to become better citizens and more identified with the growth and welfare of the country. The original purpose is well foreshadowed by the name of "Building Associations," and the loan feature was a mere incident to effect its primary object. The theory was to enable persons whose earnings were small to become, by a system of compulsory saving, the owners of homesteads either at the end of a certain time or in anticipation of it; and the scheme, as originally framed, was not complicated or difficult to understand.

It has been well said: "A building and loan association is an organization created for the purpose of accumulating a fund by the monthly subscriptions and savings of its members, to assist them in building or purchasing for themselves dwellings or real estate by loaning to them the requisite money from the funds of the society, upon good security." 2 Am. & Eng. Enc. L., 604.

And again: "To all practical intents it may be said they enable a number of associates to combine and invest their savings to mutual advantage, so that from time to time any individual among them may receive, out of the accumulation of the pittances which each contributes periodically, a sum by way

of loan wherewith to buy or build a house, mortgaging it to the association as security for the money borrowed, and ultimately making it absolutely his own by paying off the incumbrance out of his subscription. It is only so far as they serve these purposes, and are confined to the objects necessarily involved therein, that the acts of the building association fall properly within the powers granted to them. As soon as they transgress their limits, they are acting *ultra vires.*" Endlich on B. & L. Associations, Sec. 283.

And again: "If a building association invests its money in the purchase of real estate (and, it may be added, in any other way), looking forward to an increase in its value for the realization of a great gain, to the exclusion of a member who desires the whole or a portion of that money, to enable him to acquire and improve real estate of his own, and who offers acceptable security for the loan, it is doing precisely what it was not created for. It is tying up money, whilst its business is to let it circulate; it is making large gains, which enrich the wealthy, who can afford to wait, and confers but little benefit on the poor, who stand in need of immediate accommodation; it is incurring great hazards when its business is intended to be conducted on slight risk and moderate profits; it is denying its assistance to those for whose benefit it was endowed with liberal powers by statute; it is making membership with its continual payments an oppres-

sion to those to whom it was intended to be a
blessing, denying them what it was meant to insure,
and enforcing upon them a policy and drawing them
into speculations inconsistent with their necessities
and resources; and it is defrauding the State, from
whom it holds its franchises for a specified end,
whilst adopting the very course by which that end
will most effectually be defeated of its accomplish-
ment.'' Endlich on B. & L. Associations, Sec. 20.

As originally designed, their object was in the
highest degree laudable, and consonant with the
broadest public policy. It was these features that
commended them to public favor and to the special
consideration of Legislatures to such an unusual de-
gree. But building and loan associations, when used as
mere depositories for the idle money of the capitalist,
large or small, to be used in loans to enrich the
depositor, at the expense of the needy borrower,
would never have acquired the unusual rights and
powers given them by the different Legislatures.
It has been well said that the desirableness of aug-
menting the proportion of landowners, and to add
houses among the working classes, was such a
weighty consideration that Legislatures were willing,
in order to effect it, to make exceptions to many
of the best settled rules of policy applicable to
dealings between man and man. But many of these
associations have gone astray from their real pur-
pose, and made themselves mere money lending de-
vices; and scheme after scheme has been added to the

original plans, until their systems have become so complicated that the members do not understand them, and often are entrapped by them; and their results can only be reached, if at all, by an expert, after long and uncertain calculations.  Just so far as they have held to the primary purposes of their creation and conformed to the statutes giving them extraordinary privileges, just so far ought they to be encouraged and upheld by the Courts, but just so far as they depart from that original design, and fail to conform to the statutes, and make themselves mere savings banks, or loan institutions, to gather unlawful interest and entrap and oppress the needy, they should be restrained.  In their original conception, one of the leading features was that the members were kept upon a strictly co-operative basis, with mutual advantages and benefits, and, if profits were realized, they were equally distributed between the borrowers and those who did not borrow, keeping in view all the time the primary object of furnishing homes for those who desired them.  It is upon this idea that a premium over lawful interest was allowed to be paid for the loan of money, and, in order that all might stand upon the same footing, the money loaned was offered in free and fair competition and the profits earned went equally to the borrower and the member who did not borrow.

In the case of *Stiles' Appeal*, 9 W. N. C., 83 (92 Pa., 123), it is said: "Building associations are bound to offer all the money in their treasury

to open · competition,. so that the members may ob-
·tain the loan at a low premium if there should be
no bid at a higher one.    This is a most valuable
feature in such associations, and hence the impor-
tance of maintaining · the principle of free competi-
tion in the bids.    When a member is told that there
is a minimum below which loans will not be made,
he must offer that amount for the loan whether any
other one offers or not.    If no offer to that amount
is made, the money remains in the treasury without
investment.    It is evident that in this way members
who are not borrowers will obtain a very undue ad-
vantage over the members who are borrowers.    These
institutions, like everything else human, are liable
to abuse, and they must be guarded carefully to
prevent them from being perverted into mere con-
trivances by which capitalists can evade the laws of
usury.    It was never intended originally to have
classes among shareholders—one· class being lenders
exclusively, and the other borrowers only; one fur-
nishing his money to be loaned for as high premium
as could be secured, and the other borrowing at such
rates as his necessities forced him to submit to.    It
may transpire that a portion of the members will
never borrow, but this is a mere incident, and not
a part of the original design.    Hence it is impor-
tant that the premium or bonus to be paid by any
member upon any advancement to him by the society,
should be fixed by free and open competition be-
tween all the co-operating members, and in no other

way.   Competition  is  the  only  way  to  determine
what  the  borrower  should  pay.    If  he  obtains  it  at
a  low  rate,  he  will  at  last  have  paid  more  than
anyone  else  was  willing  to  pay,  and  if  he  gets  it
at  a  high  rate  he  will  share  in  the  profits  to  the
extent  of  his  stock.

"Strict  mutuality  and  equality  of  benefits  and
obligations  must  be  kept  the  groundwork  and  basis
of  these  associations,  and  if  they  are  not  so  founded
they  are  not  truly  building  and  loan  associations,
entitled  to  the  protection  given  such  associations  by
the  statute.    If  one  man  should  loan  another  $800
upon  the  agreement  that  the  other  would  repay  him
$1,000  in  monthly  installments  of  $20,  or  other
amounts  in  addition  to  legal  interest  upon  the  amount
received,  the  contract  would  be  clearly  usurious.
Still  less  inviting  would  the  arrangement  appear  if
the  obligation  of  the  borrower  was  enforced  by  an
elaborate  system  of  fines  and  forfeitures.    There
must,  therefore,  be  something  peculiar  to  the  build-
ing  association  loan  by  which  the  debtor  receives
some  *quid  pro  quo*  in  return  for  the  onerous
liabilities  which  he  assumes,  and  by  which  the  trans-
action,  though  apparently  usurious  and  oppressive,
is  rendered  really  equitable  and  mutual.    The  mutu-
ality  lies  in  the  fact  that,  after  the  loan,  the  bor-
rower  still  retains  his  membership  in  the  association
and  all  the  rights  and  privileges  belonging  thereto,
and  stands  to  the  association  in  the  twofold  rela-
tion  of  debtor  and  member.    As  a  debtor,  he  is

bound to pay premiums, interest, and dues; as a member, he has a proportionate interest to the extent of his stock in his own payments, and whatever profits the association may make redounds to his own advantage by hastening the day of final settlement (and, we may add, increases his profits) and shortens the time to which his payments must be continued." 2 Am. & Eng. Enc. L., page 610, Sec. 5; *Becket* v. *The Uniontown Association*, 88 Pa. St., 211–216; *Security Loan Association* v. *Lake*, 69 Ala., 456.

Coming to a consideration of our own statutes, it is worthy of remark that the Act of 1875, Ch. 142, Sec. 14, providing for chartering these institutions, refers to them and incorporates them as "building associations," not using the word loan, showing the primary object of their creation. Code (M. & V.), § 1742.

Section 1744 provides that the funds of such corporation may be loaned to the stockholders in such manner and on such terms and conditions and under such regulations as the corporation, by its constitution and by-laws, may prescribe, giving preference to stockholders.

Section 1751 provides that the loan shall be made at stated meetings, in open meeting, to the highest bidder.

Section 1754 provides · that the premium thus bid shall be paid before the loan is consummated, not as part of the loan, nor as interest, but as a

means of determining which one of the shareholders shall receive the loan, when there are more than one desiring it.

By the Act of 1893, Ch. 12, it is provided that loans may be made either in open meeting or on written application and bids. The idea of competition in such loans is carefully kept up and preserved in all the Acts. It was this feature of free and open competition in securing the loans that induced this Court, in the leading case of *Patterson* v. *The Workingman's Building Association*, 14 Lea, 677, to uphold such loans as not usurious and unlawful.

It is said in Endlich on B. & L. Associations, Sec. 409: "A premium, in order to be lawful, must be one that is bid for the right of precedence in taking a loan at a competitive sale, and when there was no such sale and no bid, there can be no lawful premium. In other words, when it was simply agreed between a borrower and an association that he was to have a loan at a certain premium, not the result of any competitive sale, but of mere consent between the parties, it was held that the loan was usurious. The so-called premiums, said the Court, was, in fact, a part of the price named by the lender to be paid by the borrower for the use of the money loaned. The assent of the borrower to pay the price required did not make him a bidder within the meaning of the statute, and calling the rate a premium does not change the na-

13 P—28

ture of the transaction. *Bates* v. *Association*, 42 Ohio, 655. It is true that such a rule fixing a minimum premium will not, of itself, vitiate and avoid a loan. It must appear that the special contract was made under the rule, and that the special contract was made in compliance with the rule." Endlich on B. & L. Associations, Sec. 122.

But the Court of Chancery Appeals find as a fact that it was operative in this case, and that the loan was made under and in compliance with the rule. It is said that it cannot be ascertained until the stock matures whether the complainant will pay more or less than legal interest, and, hence, the question of usury, and amount of same, cannot now be ascertained. It is also said that if the scheme is carried through as designed there will not only be no usury in the transaction, but that the borrower will have had the use of the money borrowed at a less rate than six per cent., the legal rate of interest. This, of course, contemplates the entire execution of the contract for a term of years, and makes no allowance for mismanagement, unfortunate investments, and the hundred and one contingencies that attach to all business transactions extending over a series of years. The contract, upon its face, being unauthorized, illegal, and not warranted by law, the Court will not compel the borrower to continue it for years, meeting its exactions of fines and dues and interest, upon a possibility that, perchance, in the final windup, the borrower may be

shown to have paid no more than legal interest. In this connection the suggestion of the Court in *Simonton* v. *Lanier*, 71 N. C., 498, is timely, when it is said: "It is insisted with great confidence that the rate the borrower would be required to pay, if he and his fellow-borrowers would carry out their engagements, will be much less than six per cent. If that be true, no loss can come to the lender (association) if there should be a stipulation inserted in the contract that the aggregate of all sums paid by the borrower (interest being allowed to his credit) shall not exceed the sum loaned him and six per cent. interest thereon. The proposition is a simple one. Let the lender corporation, which, under the guise of a building and loan association, professes to loan money in a complicated and confusing method, insert in its contract a stipulation that, in no event, will more than six per cent. be exacted, and all trouble and difficulty will vanish. A contract with such stipulation was upheld in *Taylor* ·v. *VanBuren Association*, 56 Ark., 340."

The contract upon its face appears to be usurious; whether it will prove so may not perhaps be proven until the scheme closes, but we can see that some of the compensating features, which would, under the statute, uphold it, are entirely wanting, to wit, the right to bid in open competition for the money to be loaned, and the right of mutuality of benefits and advantages with all other members arising out of the loans and operations of the corporation. In such

case the Court will set aside the unlawful contract upon such terms as may be just, and in accordance with equity, by requiring the borrower to pay back the money borrowed and legal interest, taking credit for such payments as have been made and proper interest. In this cause, complainant asks that a balance be struck between her and the company upon this basis, as of the date of the sale of the property. In her bill, she sets out her view of such account, showing amount due from her at that date of $917.28, counting interest both ways, which, being repaid out of the amount paid the association by the bank of $1,258 upon the purchase of the property, leaves a difference of $340.72, and for this sum, with interest, the Court of Chancery Appeals gave judgment. Upon the questions involved in this litigation, we cite further the following cases, where the general purposes and proper conduct of building and loan associations are intelligently and forcibly presented: *Meroney* v. *Atlanta B. & L. Association*, 47 Am. St. Rep., 841 (and note), 873; *Bank* v. *Cook*, 46 Am. St. Rep., 200; *Reeve* v. *Ladies' Building Association*, 18 L. R. A., p. 129; Endlich on Building Associations, Secs. 7, 39 (notes), 40, 75, 113, 118, 120, 283, 392, 398, 413.

The scheme of the company, which is a Tennessee corporation, is not in harmony with the statutes creating it, and is unlawful and usurious. We see no error in the decree of the Court of Chancery Appeals, and it is affirmed.