Argued 28 December, 1900; decided 7 January, 1901.

## WASHINGTON INVESTMENT ASS'N *v.* STANLEY.

[63 Pac. 489.]

MORTGAGE FORECLOSURE — SUFFICIENCY OF COMPLAINT.

1. A complaint in a mortgage foreclosure suit setting out in full a promissory note, averring the ownership and nonpayment thereof, and that it was secured by a regularly recorded mortgage on certain described realty, sufficiently states a cause of suit, after trial, in the absence of a demurrer, though the mortgage is not set out *in haec verba* or its legal effect pleaded: *Berry* v. *King*, 15 Or. 165, cited.

ESTOPPEL TO DENY EXISTENCE OF DE FACTO CORPORATION.*

2. Where a private corporation has attempted in good faith to comply with the laws governing its organization, persons who have borrowed from it, accepted its stock, and dealt with it in its corporate capacity, cannot question its corporate capacity to enforce its contracts because the law has not been fully complied with in its organization, and this statutory rule applies to building and loan associations as well as to other corporations.

BUILDING ASSOCIATION — EVIDENCE OF AUTHORITY.

3. Under Laws 1895, p. 103, providing that, if the Secretary of State is satisfied that a foreign building association has complied with the requirements of the laws entitling it to do business in the state, he shall issue his certificate stating such compliance, such certificate is sufficient to establish, *prima facie*, the authority of a building association holding it to do business in the state.

BUILDING ASSOCIATION — ANNUAL PREMIUM — USURY.†

4. Under a statute such as Laws 1895, p. 103, requiring (Section 4)

---

*NOTE.—On the question of estoppel to deny the existence and capacity of a corporation after dealing with it, see notes to *Empire Mills* v. *Alston Grocery Co.*, 12 L. R. A. 366; *Cone Exp. & Com. Co.* v. *Poole*, 24 L. R. A. 289, 297; *Edison Elec. Co.* v. *Canadian Pac. Nav. Co.*, 24 L. R. A. 315, 320 (40 Am. St. Rep. 916); *People* v. *Montecito Water Co.*, 33 Am. St. Rep. 172, 180.—REPORTER.

†NOTE.—In 46 Am. St. Rep. 178, is a special monograph, What Transactions are Usurious, on pages 200, 202 of which is a review of the authorities relating to usurious contracts of building and loan associations. See, also, *Fall* v. *United States, etc., Building Co.*, 38 Am. St. Rep. 194,

the by-laws of building and loan associations to provide for the amount of the premium on loans and the rate of interest thereon; and declaring (Section 6) that its provisions relating to bidding on loans shall not apply to those associations that fix in their by-laws the rate of interest and the premium on loans; and (Section 7) that no premium taken by a building and loan association shall be treated as interest, or render the association amenable to the usury laws; a contract with such an association stipulating for a given rate of interest on the loan, and a premium at a stated per cent per annum on the face of the loan, payable during the life of the contract, is usurious, if the premium and the interest together exceed the legal interest. Such a contract is illegal under the statute, for that does not permit the fixing of a premium by a rate per cent on the amount of the loan and dependent as to the time of its payment on the time the loan may remain unpaid; and it is illegal under the established rule for fixing premiums in such associations, which is by the payment of a fixed and agreed sum, usually determined by bidding.

FOREIGN CORPORATIONS — TRANSACTING BUSINESS.*

5. Where a foreign corporation loaned money in Oregon through a local agent, taking as evidence of the transaction a promissory note and a mortgage on Oregon land to secure its payment, and brings suit in the local courts on the contract, it has done business in this state, within the meaning of Laws 1895, p. 103, § 15, prescribing the conditions on which building and loan companies may "do business" in Oregon.

LOCAL OR FOREIGN CONTRACT — DOMICIL OF PARTIES.

6. A contract made in Oregon between a citizen of Oregon and a foreign corporation doing business here, relating to Oregon property and sued on in the Oregon courts, is an Oregon contract, and must be construed according to local law.

---

212 (24 L. R. A. 174). Usury in Loans by Building Associations is the subject of a long note in 18 L. R. A. 129. See, also, *Iowa Savings & Loan Assoc.* v. *Heidt*, 43 L. R. A. 689; *Post* v. *Mechanics' Building & Loan Assoc.*, 34 L. R. A. 201; *Pioneer Sav. & Loan Co.* v. *Cannon*, 33 L. R. A. 112, 54 Am. St. Rep. 858, and *McCauley* v. *Workingmen's Bldg. & Savings Assoc.*, 56 Am. St. Rep. 813, s. c. 35 L. R. A. 244, with note, Fixed Premiums or Fixed Minimum of Premiums in Building and Loan Associations, and *Borrower's & Inv. Bldg. Assoc.* v. *Eklund*, 52 L. R. A. 637.—REPORTER.

*NOTE.—On the question, what is doing business in a state, with reference to such statutes, see *State of North Carolina* v. *Ray*, 14 L. R. A. 529; *Houston* v. *Gerye*, 14 L. R. A. 719; *Cone Ex. & Commis. Co.* v. *Poole*, 24 L. R. A. 289, 295; *Milan M. & Mfg. Co.* v. *Gorton*, 26 L. R. A. 135; *Florsheim Bros. Dry Goods Co.* v. *Lester*, 27 L. R. A. 506, 46 Am. St. Rep. 162; *Delaware, etc., Canal Co.* v. *Mahlenbrock*, 45 L. R. A. 538; *Commercial Bank* v. *Sherman*, 52 Am. St. Rep. 811; *State* v. *Bristol Sav. Bank*, 54 Am. St. Rep. 141.—REPORTER.

USURY — INTENT TO VIOLATE LAW REQUIRED.

7.  To constitute usury it must appear that the parties knowingly violated the law limiting the rate of hire for money; so that where the parties have honestly made a mistake as to the rate that might be lawfully charged, the defendant should be allowed credit for all that has actually been paid on account of the loan, and be charged with his loan at the legal rate.

From Polk:  HENRY H. HEWITT, Judge.

Suit by the Washington National Building, Loan and Investment Association against Hartwell B. Stanley and others to foreclose a mortgage on real estate.

The complaint avers that plaintiff is a corporation organized under the laws of the State of Washington, and that, by compliance with the requirements of the laws of this state, it is entitled to do business herein and to maintain this suit; that on September 2, 1895, Hartwell B. Stanley and wife, of Seattle, Washington, made their certain promissory note to plaintiff, of which the following is a copy: "On or before eighty-four (84) months after date, for value received, I promise to pay the Washington National Building, Loan and Investment Association, a corporation duly organized under the laws of Washington, the sum of five hundred ($500.00) dollars, with six per cent. interest per annum, and six per cent. premium per annum, thereon from date until paid, principal, interest, and premium payable in United States gold coin of the present weight and fineness, payable monthly or on before the last Saturday of each month, principal, interest, and premium payable to the treasurer of the Washington National Building, Loan and Investment Association, at Seattle, Washington. Any failure to pay interest or premium when due shall, at the election of the payee, make the principal, interest, and premium at once due, and any waiver of such right shall not prevent the payee from enforcing the right, at its elec-

38 OR.—21.

tion. The shares of stock of the Washington National Building, Loan and Investment Association held by the undersigned, as shown by the certificate of stock No. 4,895, are hereby transferred and pledged to the payee as collateral security for the performance of the conditions of this obligation and of the mortgage securing the same. And it is hereby especially agreed that if this note is placed in the hands of an attorney for collection, or if collected by suit, I agree to pay such additional sum as attorney's fees as the court may adjudge reasonable."

It is also alleged that at the same time the said Stanley and wife, for the purpose of securing the payment thereof, duly made, executed, and delivered to plaintiff their certain mortgage upon real property (describing it) in Polk County, Oregon, which was duly recorded in the office of the clerk of said county; that said note and mortgage were made with reference to, and in accordance with, the laws of the State of Washington, and that, under and by virtue of said laws, they are each valid and binding obligations; that no part of said note, either principal, interest, or premium, has been paid; that the shares of stock referred to in said mortgage are of no value whatever; that there is now due and owing from the defendants Stanley to plaintiff the sum of $500, with interest thereon at the rate of six per cent. per annum, and premium at the rate of six per cent. per annum, from September 2, 1895, and that $75 is a reasonable sum to be allowed as attorney's fees for the foreclosure of said mortgage. The prayer is for such foreclosure, and a cancellation of the defendant's stock in the association.

The defendants Stanley and wife join issue therewith, and, among other things, deny that the plaintiff had complied with the requirements of the act of February 25, 1895, entitling building and loan associations of other states to transact business within this state (Sess. Laws 1895, p. 103), or that said contract was made or executed in the State of Wash-

ington, or that they otherwise executed and delivered said mortgage, except as stated in their further and separate. answer, or that there is anything due or owing from them to the plaintiff. As a separate defense, they allege that no rate of premium is fixed by plaintiff's by-laws, as provided by section 6 of said act, and that the agreement to pay a premium of six per cent. per annum, in the manner specified in said note, is illegal and void; that said note and mortgage were executed and delivered in Polk County, Oregon; that the note was made and delivered upon a usurious agreement between the plaintiff and the defendants, and that said corporation has not complied with the provisions of said act, so as to entitle it to transact business in this state. The reply denies the material allegations of the answer, and further alleges, among other things, that plaintiff fully complied with the statute authorizing it to do business in this state, and received the certificate of the Secretary of State to that effect. The trial resulted in a decree dismissing the suit, and the plaintiff appeals. · AFFIRMED.

For appellant there was an oral argument by *Mr. Guy G. Willis,* with a brief over the names of *Mr. Willis* and *Mr. Fred L. Keenan:*

I. Unless the statute prescribing the prerequisites to the right to do business, declares that contracts made by foreign corporations which have not complied with them shall be void, the courts will not declare them to be so: *Fritts* v. *Palmer,* 132 U. S. 282; *Harris* v. *Runnels,* 53 U. S. (12 How.), 79; *Bank* v. *Matthews,* 98 U. S. 621-627; *Bank* v. *Whitney,* 103 U. S. 99-103; *Swope* v. *Leffingwell,* 105 U. S. 3; *Reynolds* v. *Bank,* 112 U. S. 405; *Fortier* v. *Bank,* 112 U. S. 439; *Myers* v. *Croft,* 80 U. S. (13 Wall.), 296; *Jones* v. *Ins. Co.,* 101 U. S. 628; *Wright* v. *Lee,* 2 S. Dak. 604; 4 S. Dak. 241.

II.   A defect in the constitution of a corporation cannot be taken advantage of collaterally.   If the plaintiff has not complied with the law, it is, both by the terms of the law and under the authorities, a matter for the state, by *quo warranto,* or other direct proceeding.   The corporation is a body corporate, *de facto,* and a party who has had the benefit of a contract with it will not be heard to object that the contract was not within its legitimate powers:   Sess. Laws 1895, p. 103, § 19; *Smith* v. *Sheeley,* 79 U. S. (12 Wall.), 361; *Gold Mine Co.* v. *National Bank,* 96 U. S. 640; *Railway Co.* v. *McCarthy,* 96 U. S. 258; *Cowell* v. *Springs Co.,* 100 U. S. 55; *Arms Co.* v. *Barlow,* 63 N. Y. 62; *Sherwood* v. *Alvis,* 83 Ala. 115 (3 Am. St. Rep. 695); *Ray* v. *Agency Co.,* 98 Ga. 112; *Navigation Co.* v. *Weed,* 17 Barb. 380; *Kerwin* v. *Meyers,* 71 Ind. 358; *Pentacost* v. *Insurance Co.,* 79 Ind. 178; *Elston* v. *Piggott,* 94 Ind. 19; *Carlow* v. *Aultman,* 28 Neb. 672; *Insurance Co.* v. *McMillen,* 24 Ohio St. 67; *Clark* v. *Middleton,* 19 Mo. 53.

III.   The provision in the Act of 1895 (Laws 1895, p. 103, § 19), that any building and loan association, upon violation of or failure to comply with any provisions of that act, shall have no right or authority to do or transact any further business in this state, is a penalty, as is also the provision in sections 25 and 26 of that act.   Where a penalty is prescribed, it is exclusive; therefore no past transactions are affected by the failure of the company to comply with the law.   The penalty is exclusion not confiscation:   *Toledo Tie & L. Co.* v. *Thomas,* 33 W. Va. 566 (25 Am. St. Rep. 925); *State Mut. Fire Ins. Co.* v. *Brinkley Stave Co.,* 61 Ark. 1 (54 Am. St. Rep. 191, 29 L. R. A. 712); *Rockford Ins. Co.* v. *Rogers,* 9 Colo. App. 241 (47 Pac. 849); *Utley* v. *Mining Co.,* 4 Colo. 369; *Kindel* v. *Beck Lith. Co.,* 19 Colo. 310 (24 L. R. A. 311); *Manufacturing Co.* v. *Ferguson,* 113 U. S. 727; *Fritts* v. *Palmer,* 132 U. S. 282; *Dearborn Foundry Co.* v. *Augustine,* 5

Wash. 67; *Edison Elec. Co.* v. *Canadian Pac. Nav. Co.,* 8 Wash. 370 (24 L. R. A. 315, 40 Am. St. Rep. 910) ; *Hartford Ins. Co.* v. *Matthews,* 102 Mass. 225; *Jarvis-Conklin Co.* v. *Willhoit,* 84 Fed. 514; *Insurance Co.* v. *Salt Co.,* 31 Mich. 346; Morawetz, Priv. Corp., §§ 665, 666; *Insurance Co.* v. *Walsh,* 18 Mo. 229; *Clark* v. *Middleton,* 19 Mo. 53; *Insurance Co.* v. *McMillen,* 24 Ohio St. 67.

IV. The certificate of the Secretary of State, provided for in the act, is a franchise emanating from the state, and conferred upon plaintiff the right to do business as long as it was in force. It could not be gone behind, or revoked, by any authority except that of the state: *State ex rel. Richards* v. *Ackerman,* 51 Ohio St. 163; *State* v. *Fidelity & Casualty Co.,* 49 Ohio St. 440 (34 Am. St. Rep. 573); *State* v. *Insurance Co.,* 47 Ohio St. 167; *State* v. *Fidelity & Casualty Co.,* 39 Minn. 538; *Lancaster* v. *Amsterdam Imp. Co.,* 140 N. Y. 576 (24 L. R. A. 322) ; *Methodist Episcopal Church* v. *Prickett,* 19 N. Y. 482; *People* v. *Trustees,* 5 Wend. 211; *Wright* v. *Lee,* 2 S. Dak. 604; *Grant* v. *Coal Co.,* 80 Pa. St. 208; *State* v. *Railroad Co.,* 25 Vt. 433.

V. The taking of a promissory note or a mortgage to secure it, or any other single act of business, is not doing business in the state, within the meaning of such statutes: *Commercial Bank* v. *Sherman,* 28 Or. 573, 577 (52 Am. St. Rep. 811, 43 Pac. 658) ; *Simplex Dairy Co.* v. *Cole,* 86 Fed. 739; *Gilchrist* v. *Railroad Co.,* 47 Fed. 593; *Chase Elevator Co.* v. *Boston Towboat Co.,* 152 Mass. 432 (28 N. E. 300) ; *Manufacturing Co.* v. *Ferguson,* 113 U. S. 727; *Florsheim Dry Goods Co.* v. *Lester,* 60 Ark. 120 (46 Am. St. Rep. 162, 27 L. R. A. 505, 29 S. W. 34).

VI. It is not alleged or proven that the contract was made in this state; the proposition was made to plaintiff and accepted at its domicile; the note and mortgage were drawn, dated, and payable, at the place of its domicile; therefore, the contract was entered into beyond the jurisdictional

limits of the state: *Eastern B. & L. Assoc.* v. *Bedford,* 88 Fed. 7; *Reeves* v. *Harper,* 43 La. Ann. 516; *Scottish Am. Mort. Co.* v. *Ogden,* 49 La. Ann. 8; *American Freehold Land Co.* v. *Peirce,* 49 La. Ann. 390; *Scruggs* v. *Scottish Mort. Co.,* 54 Ark. 566; *Hyde* v. *Goodnow,* 3 N. Y. 266; *Allgeyer* v. *Louisiana,* 165 U. S. 578.

For respondents there was a brief over the names of *J. L. Collins* and *R. P. Boise,* with an oral argument by *Mr. Collins* and *Mr. Raleigh Stott.*

MR. JUSTICE WOLVERTON, after stating the facts, delivered the opinion of the court.

1. One of the grounds upon which the dismissal was based is that the complaint does not state facts sufficient to constitute a cause of suit. Such insufficiency was not suggested by the defense, but was so found by the court upon its own motion, and is urged here as a correct holding in the premises. The specific objection to the complaint is that it has neither set up the mortgage by copy or exhibit, nor stated the substance or purport of its provisions, and that, therefore, the court cannot determine what are its conditions, or whether or not they, or any of them, have been broken so as to entitle the plaintiff to a foreclosure. The question not having been raised until after joining issue, all intendments must be taken in favor of the complaint. If it shows a good cause of suit, though defectively stated, it will support a decree, and ought to be allowed to stand, at this stage of the proceedings. But, if it has omitted an allegation material and necessary to a maintenance of the suit, then it must be held insufficient: *Booth* v. *Moody,* 30 Or. 222 (46 Pac. 884). It must be admitted that the pleading contains but a meager statement of the plaintiff's cause, which, if tested by demurrer, could not be sustained; but, under the circumstances, we are inclined to think that it will support a decree. It was

evidently patterned after one of the forms contained in 2 Estee, Pl. & Prac. (2 ed.), 265, Form 450. This court has held a complaint in like form good against a collateral attack: *Berry* v. *King,* 15 Or. 165 (13 Pac. 772). It is there said by Mr. Chief Justice LORD, that "it may be well doubted whether the allegation complained of is insufficient in the particular noted." While that case is perhaps not authority here, as the question has arisen in a direct proceeding, yet, giving the plaintiff advantage of all intendments, the complaint must be held to state a cause of suit.

2. The articles of incorporation appear to have been executed and acknowledged by only six persons, instead of ten, as required by the statute of Washington in the organization of such an association, and the defendants challenge the plaintiff's corporate capacity to enforce its obligations, because the law has not been complied with in the particular suggested; but, the association having apparently and in good faith attempted to comply with the law governing the organization, and the defendants being borrowers of the concern, and having received and accepted its stock and dealt with it in its corporate capacity, they cannot now be heard to question its entity. The association is, at least, a *de facto* corporation, and may maintain suits and actions against those who have dealt with it to enforce their obligations, and the state only can complain of its defective organization. "When a body of men are acting as a corporation under color of apparent organization, in pursuance of some charter or enabling act, their legal authority to act as a corporation cannot be questioned collaterally": Taylor, Priv. Corp. (4 ed.), § 145. So that, if there has been an apparent attempt to perfect an organization under the law, and there has been user in pursuance of such an attempt, the organization has acquired a *de facto* existence, which will enable it to maintain its individuality against all attacks that may arise collaterally: *Finnegan* v. *Noerenberg,* 52 Minn. 239 (38 Am.

St. Rep. 552, 53 N. W. 1150). And this rule is applicable to building and loan associations, as well as private corporations generally: *Payette* v. *Free Home Assoc., 27* Ill. App. 307; *Hagerman* v. *Ohio B. & Sav. Assoc.,* 25 Ohio St. 186.

3.  It is further insisted that the plaintiff has not complied with the requirements of our statute so as to entitle it to do business within this state. The act referred to (Laws 1895, p. 103), provides that no building and loan association organized under the laws of any other state shall do business herein, unless such association shall have securities of the value of $100,000; and that, before commencing to do business here, such association shall file with the Secretary of State an authenticated copy of its charter or articles of incorporation and by-laws, a duly-authenticated copy of a resolution adopted by the board of directors, appointing an attorney therefor, resident within this state, upon whom legal process may be served, and whose name and residence shall be stated therein, and an agreement that said association will pay any judgment that may be taken against it within sixty days after the final entry thereof, and a certificate of the authorized officer of such other state, showing that securities of the value of $100,000 are on deposit with the proper officer or trust company, in trust for all the members and creditors of such association. It is further provided that every such association doing business in this state shall, on or before the first day of September of each year, deposit with the Secretary of State a report of its affairs and operations for the year ending on the thirtieth day of June immediately preceding, which shall specify certain matters named in the act, and that thereupon, if the Secretary of State is satisfied that it has complied with all the provisions of the act and is entitled to do business in this state, he shall issue his certificate, stating such compliance, and that it is entitled to do business accordingly, which certificate shall be in force for a period of one year, unless sooner rescinded. By stipulation of the par-

ties, the certificate of the Honorable H. R. Kincaid, Secretary of State, bearing date August 29, 1895, only a few days prior to the date of the execution of the note and mortgage, was offered and admitted in evidence, subject to any valid objections thereto, showing that all the provisions of said act authorizing such associations to do business in this state had been complied with. No objections having been urged to the competency or relevancy of the certificate, we are of the opinion that it is adequate to establish, *prima facie* at least, the authority of the plaintiff to do business here. We will not attempt, therefore, to make further inquiry as to what was in reality done by the association to the end that it might lawfully transact business in this state.

4. The mortgage recites that it is given to secure a loan upon five shares of stock, the monthly payments on which, amounting to $3.25, the mortgagors covenant and agree to make until said stock becomes fully paid up; and the conditions thereof are that if the mortgagors shall well and truly pay, or cause to be paid, to the association, at its home office at Seattle, Wash., the sum of $500, according to the conditions of the promissory note set out therein, with interest before and after maturity at the rate of six per cent. per annum until paid, payable monthly, and a premium at the rate of six per cent. per annum, payable at the same time and in the same manner as the interest, or shall pay, or cause to be paid, at the home office, all installments of interest and premium which become due on such stock until it becomes fully paid, and before any of said installments shall have been past due a period of six months, and shall surrender such stock in payment of the note, then said mortgage to become void, otherwise to be and remain in full force and effect. The stipulated facts show that the plaintiff, by resolution of its board of directors, appointed Guy G. Willis, of Portland, Oregon, its attorney for the State of Oregon, upon whom legal process might be served, to hold until another should be ap-

pointed to succeed him; that the defendants Stanley were not in the State of Washington on the second of September, 1895, when said note and mortgage were signed, acknowledged, and delivered; that on the seventh of August preceding the defendant H. B. Stanley made application to the plaintiff for a loan, and at the same time applied in writing for ten shares of stock in the association; that plaintiff issued to Stanley its certificate for ten shares of stock, and at the date of execution of the note and mortgage he redelivered the same to plaintiff as collateral security for the loan; that said application for a loan and stock was made at Dallas, Oregon, through one W. G. Wright, who represented that plaintiff had money for such investment, and the note and mortgage were there executed, acknowledged, and delivered to the plaintiff. The mortgage, however, contains a provision that it is understood to be made with reference to and under the laws of the State of Washington.

This brings us to the pivotal, and most difficult, question in the case, which is whether the note and mortgage, which must be construed together as one instrument, are tainted with usury. For a proper determination thereof, very much depends upon the precise nature and purpose of a building and loan or savings and loan association. The title of the act granting special and peculiar privileges to such organizations in this state is, "To regulate the incorporation and business of building and loan and savings and loan associations doing a general business": Laws 1895, p. 103. There is no distinction between a building and loan and savings and loan association, and the two appellations were used to designate but one class of societies, viz., those doing a savings and loan or investment business on the building society plan. Associations of this kind enable persons belonging to a deserving class, whose earnings are small, and with whom the slowness of accumulation discourages the effort, by the process of gradual and enforced savings to become, either at

the end of a certain period, or by anticipation of it, the owners of homesteads. It is by reason of the peculiar character of this particular class of associations, and because of their capability, when conducted upon the plan which essentially distinguishes them from other organizations and business enterprises, that they have acquired, under the law, distinct and peculiar rights and privileges. The act was designed, therefore, to encourage and extend the particular privileges therein designated to this peculiar class of organizations. None other can claim the benefits and immunities accorded them, and these only when they pursue the especial business, and observe the exceptional rules, which characterize them, and make them peculiar, as compared with other business enterprises.

A building association, as now existing, is defined by Thompson as "a private corporation designed for the accumulation, by the members, of their money, by periodical payments into its treasury, to be invested from time to time in loans to the members upon real estate for home purposes, the borrowing members paying interest, and a preference in securing loans over other members, and continuing their fixed periodical installments in addition; all of which payments, together with the nonborrower's payments, including fines for failure to pay such fixed installments, forfeitures for such continued failure of such payments, fees for transferring stock, membership fees required upon the entrance of the member into the society, and such other revenues, go into the common fund until such time as that the installment payments and profits aggregate the face value of all the shares in the association, when the assets, after the payment of the expenses and losses, are prorated among all the members, which, in legal effect, cancels the borrower's debt, and gives the nonborrower the amount of his stock": Thompson, Bldg. Assoc. (2 ed.), § 3. Mr. Endlich defines such association as a "private corporation, erected for such

a period of time as may be permitted by the laws under which it is incorporated, for the accumulation, from fixed periodical contributions of its shareholders and the profits upon their investment, of a fund, to be applied, from time to time, in accommodating such shareholders with loans or advancements, for the purpose, primarily, of acquiring the free possession of real estate, and constructing dwellings, under terms and regulations sanctioned by experience, and prescribed by legislation, and the charter and by-laws of the association, upon principles of strict mutuality and equality of benefits and obligations, with the effect of gradually extinguishing the liability incurred from such loans and advancements simultaneously with the prescribed continuance of the shareholder's periodical contributions upon the stock held by him in the association; the said periodical contributions being so calculated as to amount, in the aggregate, at compound interest, to the par value of all the shares, as agreed upon at the formation of the society and fixed by its charter, within the period allowed for the anticipated duration of the society, or the continuance of the contributions, after deduction of all the necessary expenses of the business": Endlich, Bldg. Assoc., § 39. See, also, *State* v. *Redwood Falls B. & L. Assoc.,* 45 Minn. 154 (47 N. W. 540).

The societies in this country were first organized under the plan evolved in England. Lord Chancellor Cranworth, describing their operations in that country under the provisions of Act 6 & 7 Wm. IV. c. 32, §§ 1, 3-5, says: "Members subscribe monthly sums, which are accumulated till the fund is sufficient to give a stipulated sum to each member, and then the whole is divided among them. In the society now in question the sum to be raised for each member is £100. If this were all, it would be a very simple transaction,—mere accumulation,—and the only question would be how to invest the sums subscribed to the greatest advantage.

But this is not all. One main object is to enable members to obtain their £100 by anticipation on their allowing a large discount. For this purpose, when a sufficient fund is in the hands of the treasurer, the members who desire to get their shares in advance bid, by a sort of auction, the sum which they are ready to allow as discount, and the highest bidder obtains the advance. Thus, if at the end of a year a sum of £500 is in the hands of the treasurer arising from the monthly subscriptions, and the holder of ten shares is willing to allow a discount of fifty per cent (no one offering more), the £500 is or may be advanced to him, being £50 in satisfaction of each of his ten shares. For this accommodation he is bound to pay monthly, till a fund is raised sufficient to give £100 per share to all the other members, not only the original monthly subscription, but also a further monthly sum, called 'redemption money' ": *Fleming* v. *Self,* 3 De Gex, M. & G. 997, 1012. For a more extended and a very lucid explanation of the manner of carrying on the business of these societies, see Endlich, Bldg. Assoc., § 8 *et seq.* Societies of this description, working under the plan thus defined and outlined, are such as the legislature had in view when the act was passed authorizing their incorporation, and extending to them peculiar privileges withheld from other business enterprises.

Among these privileges, is one by which a certain premium may be taken from the borrower for the right of securing a loan from the organization, without entailing the consequences of practicing usury. Let us now inquire touching the nature of the premium peculiar to this class of associations. As understood by text writers, it is a "bonus charged to a stockholder wishing to borrow, for the privilege of anticipating the ultimate value of his stock by obtaining the immediate use of the money his stock will be worth at the winding up": Wrigley, "The Workingman's Way to Wealth," 67. After quoting Wrigley's definition,

Mr. Endlich observes that, "in effect, it is the conventional difference between the par value of the share advanced and the amount actually received by the borrower": Endlich, Bldg. Assoc., § 388. Messrs. Thornton and Blackledge define it as "the amount which a stockholder, desiring to borrow, is willing to pay for the privilege of anticipating the ultimate value of his stock, by obtaining at once the use of the amount of money his stock will be worth when the association is wound up": Thornton & Blackledge, Bldg. & Loan Assoc., § 222. "It is the difference," says WOOD, J., in *Sullivan* v. *Build. & L. Assoc.*, 70 Miss. 94 (12 South. 590), "estimated by the association and its borrowing member, between the par value of the member's shares of stock and their present real value. It is the bonus which appellant might lawfully agree to pay for a present advancement in cash of a sum certain for the virtual transfer to the association of his shares of stock, which, in the final winding up of its affairs, may realize the sum actually received by the member, together with the premium bid, or which may not." Mr. Justice COOPER, in *Patterson* v. *Workingmen's B. & L. Assoc.*, 14 Lea, 677, 687, after giving briefly the history of those associations and the manner of their operation, says: "For the advance upon the dividends by way of anticipation, and the amount which the member was willing to give out of the final dividend for the preference of an advance, the words 'loan' and 'premium' or 'bonus' were used." Speaking interchangeably of the nature of the transaction and the consideration for the preference, GREEN, J., in *Pfeister* v. *Wheeling B. & L. Assoc.*, 19 W. Va. 676, 686, says: "Having no English word to express accurately this abatement, they might have called it, as they did, 'the premium bid for the right of precedence in taking the loan.' And, there being no appropriate word to represent this transaction, it would naturally come to be called by various names, which, with more or less accuracy, would in a word

or brief phrase give an idea of it.   Some might call it a 're-
demption of his interest in the association,' as the ultimate
effect of it would be that he would, at the close of the asso-
ciation, get no money from it, because what would be other-
wise coming to him would be absorbed by the payment of his
note, and this abatement he had agreed to, or his 'premium,'
as it is generally called.   Sometimes it would be called for
the like reason, but with still more inaccuracy, 'a purchase
of all his interest in the association, by the association.' And,
as the loan is really to be ultimately paid by offsetting his
interest in the association against this note to the associa-
tion, it would sometimes, with much more accuracy, be
called 'a loan on his interest in the association.' "   And,
again, in *Mutual Sav. Assoc.* v. *Wilcox,* 24 Conn. 147, in
speaking of the term "bonus," as used in the statute, the
court say: "By that expression we think that they meant
something definite; something distinct, and independent of
the interest, in the ordinary acceptation of the term; * * *
a definite sum for a loan for a specified time, and not any-
thing which the parties in their contract might choose to
denominate a bonus."

It is fairly deducible from these authorities that the sig-
nificance of the term "premium," within the meaning of
the law of building and loan associations, is a bonus in re-
ality, or a definite fixed sum or amount agreed upon between
the contracting parties,—the association and the borrower.
Representing, as it does, the conventional difference be-
tween the par value of the share advanced and the amount
actually received by the borrower, it is susceptible, in the-
ory, at least, of definite and exact ascertainment, and it is
a part and purpose of the scheme that it should be so de-
termined and settled at the outset, and stand for the con-
sideration upon which the loan or advancement is made.
The usual method, and the most satisfactory and equitable
way, of arriving at the premium to be paid for the privilege

of obtaining the advancement, is by a bidding between the members wanting the accumulated funds; the highest bid, or the one offering the largest premium or bonus, taking the funds to the amount desired. By this method, the amount of the premium is ascertained, and becomes a lump sum, to be paid to, or, rather, to be retained by, the association from the borrower for his privilege of being preferred over other members desiring the use of the funds of the association. It would seem that the practice of charging "fixed premiums"—that is, premiums prescribed by the by-laws of the association or the board of directors, and not determined by competitive bidding—has become prevalent to some extent among "national" associations: Thompson, Bldg. Assoc. (2 ed.), § 191. But the author of this work cites no case where the practice has been upheld, while many are referred to which condemn it as violative of one of the distinctive and most salutary principles characterizing these peculiar associations, which is that the money should be put up for sale, usually denominated "auction," and the highest bid fixes the amount of the premium, and determines, as between members, who shall obtain the loan: *Vermont L. & T. Co.* v. *Whithed,* 2 N. Dak. 82 (49 N. W. 318); *Butler* v. *Mutual Aid Co.,* 94 Ga. 562 (20 S. E. 101); *State* v. *Building Assoc.,* 35 Ohio St. 258; *Bates* v. *Peoples' Assoc.,* 42 Ohio St. 655; *Brown* v. *Archer,* 62 Mo. App. 277; *Meroney* v. *Atlanta B. & L. Assoc.,* 116 N. C. 882 (47 Am. St. Rep. 841, 21 S. E. 924); *Boone* v. *Homestead Loan Assoc.,* 23 N. Y. Supp. 203; *McCauley* v. *Workingmen's B. & L. Assoc.,* 97 Tenn. 421 (35 L. R. A. 244, 37 S. W. 212, 56 Am. St. Rep. 813). In a footnote to the last case cited, Mr. Burdett A. Rich, one of the annotators of those valuable reports, the L. R. A. series, makes this observation: "In America the reported cases which have discussed the matter all seem to condemn fixed premiums or any rule to limit the usual scheme of free bidding."

These loans, where upheld as not usurious, when the premium, added to the redemption money or interest, exceeds the lawful rate of interest, are supported upon the ground that the transaction is not, in all of its essentials, a loan, but an anticipatory advancement, by way of discount, of the share the member would otherwise be entitled to claim payment of on the termination of the society, coupled with the idea that it is a dealing with what is virtually a co-partnership fund, or one in which all the members, including the borrower, are mutually interested: *Seagrave* v. *Pope,* 1 De Gex, M. & G. 783; *Silver* v. *Barnes,* 8 Scott, 300. This is, in brief, the *rationale* of the English doctrine, which has been adopted by many of the states of the Union: *Hoboken Bldg. Assoc.* v. *Martin,* 13 N. J. Eq. 427; *Clarksville B. & L. Assoc.* v. *Stephens,* 26 N. J. Eq. 351; *McLaughlin* v. *Citizens' B. & S. Assoc.,* 62 Ind. 264; *Homestead Company* v. *Linigan,* 46 La. Ann. 1118 (15 South. 369); *Robertson* v. *Amer. Homestead Assoc.,* 10 Md. 397 (69 Am. Dec. 145); *Massey* v. *Building Assoc.,* 22 Kan. 624; *Sullivan* v. *Building & L. Assoc.,* 70 Miss. 94 (12 South. 590); *Merrill* v. *McIntire,* 13 Gray, 157; *Tilley* v. *American B. & L. Assoc.* (C. C.), 52 Fed. 618; *Holmes* v. *Smythe,* 100 Ill. 413; *Central B. & L. Assoc.* v. *Lampson,* 60 Minn. 422 (62 N. W. 544); *Winchester Bldg. Assoc.* v. *Gilbert,* 23 Grat. 787.

Our statute prescribes (Laws 1895, p. 103, § 4), that the association shall adopt by-laws, which, among other things, shall "especially provide for the character and methods of conducting the business of the association, with rules governing the admission of members, the sale of its shares, the amount of admission fee, the amount of and the periods when dues shall be paid by the members to the association, the disposition and investment of the funds of the association, including loans, the amount of premiums to be paid for

and the rate of interest on loans," etc; and section 6, that the by-laws shall provide for the mode in which the application or bids for loans shall be made and received, and who shall be entitled to preference in allotting the same, but it contains a proviso as follows: "That the provisions of this section, relating to bidding for loans, shall not apply to associations which fix the rate of interest and premium in its by-laws or annually, by resolution of the board of directors, at a rate which will keep the money of such association at all times safely invested and in which the system of bidding is not allowed. The minimum amount and nature of premiums to be bid or asked for loans shall be fixed and described in the by-laws, but the same may from time to time be changed by a two-thirds vote of all the members of the board of directors." Section 7 provides that "any premium which has heretofore or which shall hereafter be taken for loans    *    *    *    made by any association governed by this act, shall not be considered or treated as interest, nor render such association amenable to the laws relating to usury." Does this statute permit the taking of a rate of premium such as is stated in the obligation set out in the complaint which the plaintiff seeks to foreclose? Section 4 requires the by-laws to provide for the amount of the premium to be paid for, and the rate of interest on, loans. This obviously treats the premium as something different in character from interest, and is in perfect accord with another provision to be contained in the by-laws, prescribing the mode by which bids for loans shall be made, obtained, and received; for, when the two are observed, the amount of the premium becomes definitely fixed and determined, and in that respect is well distinguished from the interest.

But when we come to the proviso of section 6, above noted, the intendment of the legislature is not so clear. It may be conceded, for the purposes of this case,—but we must by no means be understood as deciding it,—that it

would be legitimate for the association, through its by-laws or by resolution of its board of directors, to prescribe a minimum lump premium, or name a certain or definite amount per share to be paid as a premium, upon a loan or advancement to be made; but even this could not be held to authorize the fixing of a premium by a rate per cent. or by a percentage upon the amount of the loan, and dependent for the time of its continued payment upon the length of time the loan may remain unpaid, or the stock of the borrower be not fully paid in. There is nothing in such a condition to distinguish it from interest, and the legislature surely did not intend to say that interest shall not be treated as interest, or that interest, to be collected by the designation of premium, shall not be treated as interest. So that, when the statute speaks of the rate of premium, it does not mean the same thing as the rate of interest. The more natural and consistent interpretation would be that, when the legislature speaks of a rate of premium, it means a proportional or pro rata distribution of the payment of a premium, fixed by the by-laws or by resolution of the board of directors of the association. If it does not have this meaning, it has no other that will distinguish it from interest, and the act cannot be held to sanction the taking of any premium at all under the appellation of "rate of premium." The idea of a rate of premium corresponding to rate of interest is not within the spirit and intendment of the law of building associations, and, if that is what was attempted to be sanctioned by legislative edict, so as to relieve it from amenability to the laws relating to usury, it would be very questionable whether it could secure the warrant of the constitution, which inhibits the adoption of any special or local law relating to interest on money. Under this interpretation of the act, it is plain that the plaintiff was not warranted in exacting from the borrower the six per cent. premium upon the amount of the loan, as, when added to the six per cent.

interest, it exceeds the lawful rate which is permitted to be charged in this state as interest on money. The device has the characteristic of a shift to circumvent and avoid the law relating to usury, and cannot receive our sanction. *Meroney v. Atlanta B. & L. Assoc.*, 116 N. C. 882 (47 Am. St. Rep. 841, 21 S. E. 924), was a case where $3.25 per month, as interest and premium, was contracted to be paid upon a loan of $300, and it was held that the whole transaction could not be characterized otherwise than as "a lending of $300 to the plaintiff at twelve per cent. per annum." So it was said, in *Butler* v. *Mut. Aid. Co.*, 94 Ga. 562 (20 S. E. 101) : "It (the association) claims to loan money at six per cent. per annum, payable and collectible monthly; but under the name of premium, which is but another name for usury, collects another six per cent. monthly, by such device collecting really twelve per cent. interest per annum, payable monthly, on loans; thus, under fancy names, carefully eschewing the name of interest, which said charges really are, and, with the object and intent to do so, contracting to take and collect a higher rate of interest than that allowed by law." These cases illustrate the principle adopted, and it would seem that plaintiff's contract is usurious upon its face.

5.   The plaintiff contends, however, that the agreement must be treated as a Washington contract, and therefore should be construed with reference to the usury laws of that state, and, incidentally, that the transaction of making the loan, and taking a note payable at Seattle, Washington, and a mortgage upon lands in Oregon, to secure its payment, was not doing business within this state. It is strange reasoning to insist, on the one hand, that, in order to enable the plaintiff to sue in our courts, it has complied with the law with that particularity which will enable it to do business in the state, and yet, when it is suggested that it has violated the laws of usury here by a transaction consummated under the same authority that authorizes the suit, to insist that it has not

done business within the state. The very purpose of the act is to enable those associations having their domiciles in other states to do and transact business and sue and be sued here, and it ought to be alike effective under all conditions. When they come here under the statute, and have the license of the Secretary of State to do business here, they become *pro hac vice* domestic corporations, and must operate as if actually domiciled in the state. They submit and render themselves amenable to the laws of the state, which must be taken to govern all their transactions entered into and consummated therein. Our own citizens would not be permitted to make contracts here payable in another state, and then insist upon having them construed here according to the laws of such state; and it does not seem consistent with principle and reason that a foreign corporation, securing citizenship in this state for the purpose of promoting its business, can insist upon making its contracts payable elsewhere, and then invoke the authority and process of our courts to enforce them according to laws other than our own. If such were to be recognized as good law, it would in many instances give foreign corporations, although domiciled in this state, advantages over those organized under its laws, and having their principal place of business here. But the transaction, under the conditions attending it, must be regarded as doing business within this state: *Bank of British Columbia* v. *Page,* 6 Or. 431 ; *Hacheny* v. *Leary,* 12 Or. 40 (7 Pac. 329) ; *Cooper Mfg. Co.* v. *Ferguson,* 113 U. S. 727 (5 Sup. Ct. 739).

6. The contract was made in Oregon, and must be construed and enforced according to our laws. The application for stock and the loan was made in Oregon, to and by an association domiciled and doing business therein, through a resident solicitor. The mortgage was given upon an Oregon farm, and was executed and acknowledged here. The money was used here, and this suit was instituted in the county in

which the mortgaged premises are situated, as contemplated by the association when it acquired the license to do business in the state. All this, notwithstanding the mortgage stipulation to the effect that it is a Washington contract, clearly shows its Oregon nativity, and it is therefore solvable by the laws thereof: *Meroney* v. *Atlanta B. & L. Assoc.,* 116 N. C. 882 (47 Am. St. Rep. 841, 21 S. E. 924) ; *Martin* v. *Johnson,* 84 Ga. 481 (10 S. E. 1092, 8 L. R. A. 170) ; *Dickinson* v. *Edwards,* 77 N. Y. 573 (33 Am. Rep. 671) ; *Jackson* v. *American Mtg. Co.,* 88 Ga. 756 (15 S. E. 812).

7. But, notwithstanding the contract appears to be usurious on its face, and the natural inference to be drawn therefrom is that the parties intended the result of their own acts, yet there is another element which must attend the practice of usury. It must be with a corrupt intent, which means that the parties must have knowingly agreed upon a rate of interest greater than that allowed by law: 27 Am. & Eng. Enc. Law (1 ed.), 925; *Balfour* v. *Davis,* 14 Or. 47 (12 Pac. 89) ; *Burwell* v. *Burgwyn,* 100 N. C. 389 (6 S. E. 409). But, where they have acted under an honest belief that the stipulated rate was recoverable under the law, in which they were mistaken, it has been held that the penalties of usury would not be enforced: *Thompson* v. *Jones,* 1 Stew. (Ala.), 556. There is no evidence in this case, aside from that which appears upon the face of the contract, by which we are or can be advised as to the true intent of these parties. Hence we may fairly suppose that they in good faith designed to act within the legislative intendment of the act governing the management and conduct of building and loan associations, and as the provisions governing in the premises are, as we have seen, of doubtful import, in view of the rule that forfeitures are never enforced except when the case is reasonably free from doubt, we have concluded to decree a foreclosure in favor of the plaintiff for the principal sum, with interest at the rate of six per cent. per annum, against which

defendants will be allowed credit for the $39 paid upon the stock. Plaintiff should also have $60 as an attorney's fee, being the amount found to be reasonable by the court below, and its costs and disbursements in both courts.

MODIFIED.