LEE B. SKINNER AND MARY E. SKINNER, HIS WIFE, *Appellants,* v. THE SOUTHERN HOME BUILDING AND LOAN ASSOCIATION OF ATLANTA, GEORGIA, A CORPORATION UNDER THE LAWS OF GEORGIA, *Appellee.*

1. Competitive bidding for the premium to be paid for the preference of priority of loans is an essential feature of the building society plan, within the meaning of chapter 4158, laws of 1893, exempting foreign building and loan associations doing business on such plan from the penalties of usury. (MAXWELL, J., dissenting.)

2. A foreign building and loan association is not permitted to charge interest at the rate of six per cent. and a fixed premium of six per cent. upon loans to its members in this State; the contract being made subject to the laws of Florida. (MAXWELL, J., dissenting.)

3. Where it appears that the legislature intended to place restrictions upon the right of foreign associations to do business in this State, there will not be imputed an intent to confer higher privileges upon them than are enjoyed by similar domestic associations unless such intent is made clear in the very language of the grant.

4. A bill for foreclosure of mortgage which prays a deficiency judgment against the husband only and general relief is not

obnoxious to the objection that it prays a deficiency judgment against the wife.

5. Usury in the loan will not prevent the recovery of the reasonable attorneys' fee provided for in the contract, where there has been default in payment of part of the principal and foreclosure lies to recover the principal of the loan.

6. The default of a stockholder borrowing from a building and loan association does not of itself change the contract between them so as to prevent the further accrual of dues, interest and fines according to its terms, though such default may give the association the option to enforce the contract for what was then due.

7. The issuance of paid-up stock by an association where no dividends are paid thereon nor preferences given thereto, does not destroy the character of the association as a building and loan association, doing business on the building society plan, within the meaning of chapter 4158, laws of 1893, exempting such an association from the usury laws.

This case was decided by the court *En Banc*.

Appeal from Circuit Court for Hillsborough county.

The facts of the case are stated in the opinion of the court.

*William Hunter* for appellants.

No appearance for appellee.

COCKRELL, J.—This case was taken up for consideration by Division ·B, but there being a difference of opinion, was referred by it to the whole court for decision.

This is a suit in equity instituted by a foreign corporation to enforce a mortgage lien, to which was interposed among other defenses that of usury.

One of the defendants, Lee B. Skinner, on March 31, 1896, secured from the Southern Home Building and Loan Association, hereafter referred to as the association, in which he held twenty-five shares of the par value of one

hundred dollars per share, a loan of twenty-five hundred dollars, to secure which loan he pledged said shares, and also gave a bond and mortgage on certain realty in this State, his wife joining him in the execution thereof. The association claims in its bill that by this contract the defendant obligated himself to pay the association as long as it should exist or as might be provided by its by-laws, rules and regulations the sum of fifteen dollars monthly, as installments due on said stock and the further sum of twenty-five dollars monthly as interest and premium on said advance; that under its by-laws the members holding stock pay one dollar per share for the first installment and sixty cents per month dues; that the membership fee of one dollar per share and the sum of ten cents per month per share is known as the expense fund and does not go to the credit of the stock, and a fine of ten cents a share is levied upon failure to pay promptly the installments due each month; that in case of foreclosure the withdrawal value of the shares held by a borrowing member may be credited to the amount due, the withdrawal value being fifty cents out of each sixty cents paid per share with six per cent. interest on the same for the average time, provided all the payments have been made thereon.

A statement of its claim, filed as an exhibit to the bill, itemizes the account as follows: Loan on real estate $2,500, 15 months dues, premium and interest $600, 14 months fines $35, balance insurance premium $8.00, total $3,143. By withdrawal balance 25 shares 32 months to Dec. 1, 1898, $429.50. Amount due Dec. 1, 1898, $2,713.50. The mortgage sought to be enforced gave the association the right and power to sell the realty "according to the statute of Florida in such cases made and provided." The defendants in their answer, to which an exception for impertinence was sustained, allege that this association did not put up its money at auction to the member bidding the highest premium, but required all borrowing members to pay a fixed premium of six per cent. per annum and a fixed interest at

six per cent. per annum, and that said defendant was so required to pay.

We have not the benefit of a brief from the appellee in disposing of the question thus raised, and have been put to considerable labor in seeking to settle the question correctly. Our usury statute is drastic and is quoted in full, with comment on its uniqueness, in *Maxwell v. Jacksonville Loan & Improvement Co.*, 45 Fla. 425, 34 South. Rep. 255-267. The second section of that statute reads as follows: "That it shall not be lawful for any person, company or corporation, to reserve, charge or take, for any loan or advance of money, or forbearance to enforce the collection of any sum of money, a rate of interest greater than ten per centum per annum, either directly or indirectly, by way of commissions for advances, discounts, exchange, or by any contract, contrivance or device whatever, whereby the debtor is required or obligated to pay a greater sum than the 'actual principal sum received, together with interest at the rate of ten per centum per annum as aforesaid; provided, however, that the business of and loans made by building and loan and other mutual benefit associations to its members, when made and conducted under the provisions of chapter 3709, laws of Florida, approved May 31, 1887, and acts amendatory thereof, and such other acts as may hereafter be passed regulating the conduct of such associations shall not be considered usurious within the intent and meaning of this act."

Omitting for the present the act of 1893, the "provisions of chapter 3709, laws of Florida, approved May 31, 1887, and acts amendatory thereof, and such other acts as may hereafter be passed regulating the conduct of such associations," referred to in this section of the usury statute, are all found in sections 2205-2213 of the Revised Statutes. Section 2207 regulates the method of loans as follows: "The officers shall hold stated meetings at which the money in the treasury, if over the fixed value of a share, shall be offered for loan in open meeting, and the stockholder who shall bid the highest premium for the preference

of priority of loan shall be entitled to receive a loan of not more than the amount fixed by charter as the full value of a share, for each share of stock held by such stockholder * * * ." We can not therefore entertain for a moment the thought that the court below held this contract to have been within the proviso to the usury statute. The court must have relied on section 8, chap. 4158 of the laws of 1893, an act entitled "An Act in relation to foreign building and loan associations." That section provides "that no fines, interest or premiums paid on loans made by any building and loan association shall be deemed usurious, and the same may be collected, as debts of like amount are now collected by law in this State, and according to the terms and stipulations of the agreement between the association and the borrower." Section 4 of the same act reads: "That the name 'building and loan association,' as used in this act, shall include all corporations, societies, organizations or associations doing a saving and loan investment business on the building society plan, *viz*: Loaning its funds to its members only, whether issuing certificates of stock which matures at a fixed time or not." Sections one, two, three, six and seven name the conditions precedent to such associations engaged in business, and section five fixes a penalty upon any agent of such association doing business unless the conditions have been fulfilled. Section nine, the final section, contains merely a repealing clause.

It appearing, therefore, that it was in the legislative mind to place restrictions upon these foreign associations doing business in the State, there will not be imputed to that body an intent to confer higher privileges upon such associations than are conferred upon its own creatures, unless that intent is made clear in the very language of the grant of such privileges.

Section eight is in its terms broad enough to cover domestic as well as foreign building and loan associations, were it not for the context and the restrictive title of the act, and it is not clear what effect such construction may

have had on the law-makers.  It is clear that the legislature
had considered the fixing of the premium by competitive
bidding an essential feature of the building and loan plan,
seeing that it imposed such method on its own corporations
of that character.  Owing to the various constructions of
the courts as to the necessity of leaving the time at which
the stock was to mature subject to the possible success of
the institution, and thus preserving the partnership feature
of the transaction, a legislative construction is placed upon
the meaning of the phrase "building society plan," and it is
declared it shall be immaterial whether the certificates of
stock mature at a fixed time or not.  Many courts had
theretofore considered an essential element of the "build-
ing society plan" the fixing of the premium to be paid for
the preference of priority of the loan to the competitive
bidding therefor at an auction held at stated times at which
any member desiring a loan had the opportunity to bid for
such preference, and yet there is an ominous silence in re-
gard to dispensing with this essential.  In doing away with
the comparatively unimportant feature of indeterminateness
as to time of maturity of stock, it is unfair to hold that it
was intended to do away with the more important feature
of indeterminateness as to the premium to be paid in case
of foreign associations, especially when there had been
thrown around domestic associations such painstaking full-
ness of detail in this regard, so as to prevent the latter
charging more than ten per cent. interest, except in the
case where the borrowing member had the chance in the
absence of an eager competitor to get his money at a much
smaller rate.  We are forced to the conclusion that section
four above quoted restricts the act to those associations
doing business on the building society plan, and that such
plan in the light of our legislation and the decisions of other
courts contemplates an opportunity to the borrowing mem-
ber to obtain his money at a premium to be ascertained by
competitive bidding.  An instructive case on this point is
that of *Washington Investment Ass'n v. Stanley*, 38 Ore-

gon, 319, 63 Pac. Rep. 489, following in *Western Savings
Co. v. Houston,* 38 Oregon, 377, 65 Pac. Rep. 611.   To the
same effect is the very exhaustive opinion of the Supreme
Court of North Carolina in the leading case of *Meroney v.
Atlanta Building & Loan Ass'n,* 116 N. C. 882, 21 S. E.
Rep. 924; see, also, *McCauley v. Workingman's Bldg. &
Sav. Ass'n,* 97 Tenn. 421, 37 S. W. Rep. 212, and the note
thereto as published in 35 L. R. A. 244; *Myers v. Alpena
Loan & Building Ass'n,* 117 Mich. 389, 75 N. W. Rep. 944;
*White v. Williams,* 90 Md. 719, 45 Atl. Rep. 1001; 7 Thomp.
Corp., sec. 8780; Endlich Build. Ass'n, secs. 19 and 409.

   Subject section four to a closer analysis.   What is
"doing a saving and loan investment business on the build-
ing society plan," and what is the effect of the clause under
the videlicet "loaning its funds to its members only, whether
issuing certificates of stock which matures at a fixed time
or not?"  By the use of the term "building society plan" the
legislature must have had reference to some definite plan,
and not to whatever scheme under a like name might be
devised in the various States or foreign countries, and hence
it is not improper to assume the legislators in the use of
such term must have had in mind the plan with which they
were familiar, that is the auction plan.   And this being
shown, does it not follow that the videlicet clause is not a
complete definition of such plan, but a qualification of the
definition usually accepted in this State, and that such
definition obtains in its full force excepting only this one
qualification.   The expression of this one qualification ex-
cludes the contemplation of any other.

   In construing this act it is well to note the general rule
of law governing foreign corporations.   Judge THOMPSON
summarizes the law thus: "Without attempting to enumer-
ate, in a single section, all the cases to which this comity
does not extend, it may be observed, in the first place, that
it does not extend so far as to concede to foreign corpora-
tions the powers which their own charters do not permit
them to exercise; nor so far as to permit a foreign cor-

poration to exercise powers within the State which a domestic corporation of the same kind is not permitted to exercise under the constitution and policy of the State." Again: "Foreign corporations must exercise their powers and franchises in accordance with the laws of the State where they do business, and in consonance with the principles of its general policy. The validity and enforceability of a contract by a foreign corporation are determined, not by its charter, but by the law prevailing where the contract is made." 2 Cook, Corp., sec. 696.

In *Falls v. United States Savings, Loan & Bldg. Co.,* 97 Ala. 417, 13 South. Rep. 25, speaking through Chief-Justice STONE, the court said: "Each separate government or State has its own legislative system and policy; and in determining and enforcing rights which originate out of our jurisdiction, comity requires that we shall admeasure the redress by the yard-stick of the place where the right accrued."

Foreign corporations have no right by the law of comity to do acts within a State which are prohibited by the laws of the State to its own citizens or corporations engaged in a similar business. 2 Merawitz, Priv. Corp., 965; 3 Clark & Marshall, Priv. Corp., sec. 838.

There remain some minor points to be disposed of. There is no merit in the contention of appellant that the bill prays a personal judgment against a married woman. The specific prayer is for such relief against the husband alone and this controls the prayer for general relief. The further contention that usury having been shown, the complainant is not entitled to the solicitors' fees provided for in the mortgage, was decided adversely to appellant in the case of *Maxwell v. Jacksonville Loan & Improvement Co., ubi supra,* on the ground "that as there was default in the payment of more than three consecutive installments, containing a part of the principal, the suit was not brought prematurely, and that complainant is entitled to reasonable solicitors' fee."

It is also contended that complainant should not have charged interest and premium for more than three months. After a default for three months the association had the option of enforcing the collection of whatever sum was then due it, but the default of the debtor did not change the contract; it continued in force until it be altered by the parties, satisfied or merged into a judgment or decree.

We do not agree with appellants in their contention that the issuance of paid-up stock by the association destroys its character as a building and loan association and in and of itself renders the contract usurious. "There is, however, nothing inconsistent with its character as such, in permitting those of its members who feel themselves in a position to make a number of stock payments not yet due, to do so, thereby anticipating without inconvenience to themselves a duty which would have to be performed in any event, and putting in the hands of the association the means of hastening the final consumation of the enterprise. Accordingly it has never been questioned that an association may allow its members to make advance payments upon the stock held by them." Endlich, Build. Ass'n, sec. 461. Whether the payments of dividends on such stock or the giving of preference to the holders thereof would change the character of these associations, or be without their scope, are questions not raised on this record; there are no allegations of such payments or of such preferences.

It follows that for the error of the court in sustaining the third exception to the answer the decree must be reversed with directions to overrule said exception and to take such further proceedings in said cause as may be agreeable to equity and in consonance with this opinion, and it is so ordered.

(SHACKLEFORD, J., being disqualified, took no part in the consideration of this case.)

MAXWELL, J., dissenting.—Section 8 of chapter 4158 of the acts of 1893, entitled "An act in relation to foreign building and loan associations," provides "that no fines, interest or premiums paid or loans made by any building and loan association shall be deemed usurious, and the same may be collected as debts of like amount are now collected by law in this State, and according to the terms and stipulations of the agreement between the association and the borrower."

If this act applies to the appellee, the Southern Home Building and Loan Association of Atlanta, Georgia, the loan made by it to the appellants will not be usurious because of the stipulation that a fixed premium amounting to six per cent. per annum be paid by the borrower, in addition to six per cent. as interest on the loan. If the appellee is a foreign building and loan association, as its name indicates, the act does apply to it and to this transaction. The opinion of the majority of the court denies its right to be so classed because of its demand of a fixed premium upon its loans instead of a premium to be ascertained by competitive bidding.

All premium charges contemplate the possibility of payment of more than the legal rate of interest on the money received. Otherwise there would be no necessity for making an exception in favor of building and loan associations in the usury law. And this is equally true whether the payment is of six per cent. interest on double the amount of money actually received on the loan (the other half being deducted in advance as a premium) or of six per cent. as interest and six per cent. as premium on the amount of the loan actually received. The one form of premium is as obnoxious to the spirit of the usury law as the other, and the adoption of the one rather than the other, therefore, would not exclude the corporation from classification as a building and loan association; and in fact our statute in regard to domestic associations does not prescribe the manner of payment of premiums, but only the method of ascertaining their amount.

It is true that the plan for domestic building and loan associations provided in our statute adopts the rule of ascertaining the premium to be required of the borrower by competitive bidding for the money to be loaned. The question is whether that feature of the plan is so essential a one that without it an association though not incorporated under that statute loses its character as a building and loan association.

To my mind the essential feature of the building and loan plan is that of providing for the repayment of loans by the maturing of the shares of stock belonging to the borrower, which are to be matured by the small regular payments stipulated in the articles of association. This enables and encourages the stockholder of limited means and small income to invest his money in a home and pay for it in installments within his reach, when without this opportunity he might be unable or unwilling to purchase a home. It also gives him as a stockholder the benefit of the earnings and profits of the association in more quickly maturing his stock and discharging his indebtedness.

The premium in addition to the regular interest charged is one of the means of profit contributing to an early maturity of the stock. The premium and interest together may amount to more than legal interest on the loan, but the law tolerates this in its willingness to encourage the building of homes by those not able to do so by other means, and the more willingly because the larger payments made by the borrowers so add to the value of their own investment in the stock of the association that by effecting an early maturity of the shares it may ultimately preclude payment of more than a fair interest on the loan.

Incidentally the premiums where they are fixed by competitive bidding are made a means of determining the priority in the making of loans where there are several applicants therefor, the loan being made to the highest bidder. The real reason of this bidding, however, is not simply to determine the order in which the loans shall be

made, as this could be determined by the order of applica-
tion for the money, or in other ways more equitable than
that of bidding for the money. It is done in order by trad-
ing upon the necessities of the borrower to secure as large
a bonus as possible for the association, in pursuance of the
policy of maturing shares as early as possible. If, then, the
policy of the law with respect to these associations is to
make the premiums, and by necessary consequence the in-
terest, paid by the borrower as large as possible, there is no
good reason to object to any reasonable premium as infring-
ing the usury law.

Fixing the amount of premium by competitive bidding
in making each loan merely introduce into the association
an element of chance whereby one class of borrowers will
profit at the expense of the others. All who bid less than
the average of all the premiums paid will profit at the
expense of those who bid more than the average. The
association as a whole will not benefit by the inequality. Its
profits will be equally great if all pay the average premium,
and the equitable plan would be to require this uniform
payment. I can not conceive that this inequality of burden,
the extent of which is dependent upon the number and
necessities of those who may happen to desire a loan at
the same time, as the successful bidder is so inherently
essential to the purpose which the statute was designed to
favor, that an association not adopting it should be excluded
from the benefits of the act in reference to such associations.

The appellee is a foreign building and loan association.
Such associations doing business over a wide territory can
not assemble their members as can the local companies, and
put their money up at auction. So far as my acquaintance
with them extends, they invariably adopt the fixed premium,
and no other would be reasonably practicable. It was in
reference to these associations doing business in this way
that the act above quoted was passed, and they should have
the benefit of it.