ATTORNEY GENERAL *vs.* ALLAN S. PITCHER* & others.

Suffolk.    March 19, 1903. — June 17, 1903.

Present: KNOWLTON, C. J., BARKER, HAMMOND, LORING, & BRALEY, JJ.

*Co-operative Bank. Statute*, Construction. *Contract*, Validity. *Attorney General. Equity Jurisdiction. Words*, "Redeemed."

R. L. c. 114, § 1, providing, under a penalty, that no person, association or corporation except certain licensed ones "shall transact the business of accumulating the savings of its members and loaning to them such accumulations in the manner of a co-operative bank, unless incorporated in this Commonwealth for such purpose", does not apply to a partnership, called the "New England Home Buyers' Association", issuing contracts to persons not members whose savings are not accumulated and lent to them in the manner of a co-operative bank, although all the reasons for the enactment of the statute may apply to the business conducted.

The obligations of a partnership called the "New England Home Buyers' Association" containing the provisions stated by the court were held to be in violation of R. L. c. 73, §§ 7, 8, prohibiting the issuing of "any bonds, certificates or obligations of any kind, which are by the terms thereof to be redeemed in numerical order or in any arbitrary order of precedence without reference to the amount previously paid thereon by the holder."

R. L. c. 73, §§ 7, 8, providing, under a penalty, that "no person or corporation shall issue, negotiate or sell any bonds, certificates or obligations of any kind,

which are by the terms thereof to be redeemed in numerical order or in any arbitrary order of precedence without reference to the amount previously paid thereon by the holder ", even if the penalties provided by § 8 for domestic corporations and foreign corporations and associations are not exclusive of other remedies, cannot be enforced on information by the Attorney General where the acts of individuals acting as copartners sought to be enjoined affect only individual purchasers; and, if the probability of a large number of purchasers of the obligations would be enough to give the Attorney General jurisdiction in such a case, which was not intimated, this is not shown where the contracts seem so plainly disadvantageous to the purchasers that no intelligent person would be expected to pay money on account of them although the scheme might be used as a snare to catch the ignorant and unwary.

INFORMATION by the Attorney General, filed January 30, 1903.

The case came on to be heard before *Hammond*, J., who by agreement of counsel reserved it on the information, answer, replication and an agreed statement of facts for the consideration of the full court, such order to be made as law and justice might require.

*F. H. Nash*, Assistant Attorney General, for the plaintiff.

*W. M. Stockbridge & J. M. Hallowell*, for the defendants.

KNOWLTON, C. J. This is an information in equity by the Attorney General to enjoin the defendants as copartners under a declaration of trust, from doing the business of issuing and selling certain obligations or contracts, under the name of the " New England Home Buyers' Association." The declaration of trust shows that the four defendants agreed to carry on this business through two of their number as trustees, who are to have the management of the business, and to hold the title to all the property that comes into their hands. So far as appears, neither of the defendants put any capital into the business. The object of each of the obligations or contracts to be issued is, professedly, to provide the purchaser with a fund " to purchase a home, farm, or other real estate, or to discharge existing incumbrances thereon, or to pay for improvements thereof." They are to be numbered in order, one number being required for each $1,000. For each $1,000, the purchaser is to pay an application fee of $3, and subsequent payments of $2.50 monthly, from each of which monthly payments $2 is to be appropriated to the home fund, thirty-five cents to the expense fund, and fifteen cents to the contingent fund. On each accumulation of

$50 in the home fund from these monthly payments by the purchaser and by parties to other like agreements which have not lapsed, or upon a sufficient accumulation in the home fund to assure the payments to be made upon the vesting of one interest, the lowest numbered fully paid up $1,000 interest which is not then a vested interest is to be deemed a vested interest, if the association has then discharged all obligations then due on outstanding vested interests. The holder of such vested interest is thereupon entitled to the benefit of monthly payments of $50 without interest, "for a period of twenty months, to be paid out of the home fund by the association to the vendor of the property proposed to be purchased, or in case of incumbrances upon property to the person holding the lien thereon, or in the case of improvements of property, to the legal creditor therefor." After the acquisition of each vested interest by the purchaser, he agrees to pay $5.50 per month on each $1,000 mentioned in the agreement, until, including the previous payments, his total payments aggregate the sum of $1,000. On each of these payments $5 is to be credited to the home fund, thirty-five cents to the expense fund, and fifteen cents to the contingent fund. When these payments of the purchaser to the association aggregate the sum of $1,000, the association is to execute and deliver to the purchaser a deed of the property purchased for him with the $1,000, or to release or cause to be released any trust deed, mortgage or other incumbrance which it may hold upon said property. Neither the trustees nor the other members of the association are to be personally liable on these contracts, and the purchasers are entitled to the benefit of no other fund than the home fund, and can only have recourse to that fund for payment, satisfaction or indemnity. Until a purchaser has paid in the whole sum of $1,000, which, if he paid according to the contract, would not be until more than seventeen years after beginning his payments, he is not entitled to any deed or instrument giving a title to any real estate, but all titles and interests in real estate are to be held by the association, leaving the purchaser no security and no right, except that given by his contract, which is enforceable against the fund alone. Until he acquires a vested interest, if he fails to make a payment within thirty days of the time when it becomes due,

his previous payments are forfeited and his contract becomes lapsed, and if after he acquires a vested interest he fails in like manner, then all future payments shall become due and payable at the option of the association, unless such delinquency results from sickness or disability, and provided, if he is unable to pay by reason of loss of employment, a forfeiture shall not be declared until the expiration of six months from the date of his last regular monthly payment. When he recovers from his disability he is to continue the future payments, and to make the suspended payments at the rate of one at the time of each regular payment. He has the privilege of paying his instalments before they become due if he chooses.

The Attorney General contends that this business violates R. L. c. 114, § 1, in relation to co-operative banks, which provides that no person, association or corporation except certain licensed ones " shall transact the business of accumulating the savings of its members and loaning to them such accumulations in the manner of a co-operative bank, unless incorporated in this Commonwealth for such purpose." This is a penal statute which makes an offender punishable by a fine of not more than $1,000. As a penal statute it must be construed strictly, and we are of opinion that the defendants are not within it. The purchasers of these contracts are not members of the association, and their savings are not savings of members, but of holders of individual contracts from the association. They have no voice in the management of the affairs of the association. No money of members of the association is lent to any of its members; the savings of these contractors are not accumulated and lent to them in the manner of a co-operative bank, but the course of dealing is very different from that of any bank. It may well be said that all the reasons for the enactment of this statute apply with great force to an association transacting a business like that of these defendants. But the defendants are not within the terms of the statute, and they cannot be punished nor enjoined under it.

The Attorney General also contends that they are violating another statute, namely, R. L. c. 73, §§ 7, 8, which forbids the negotiation or sale of " any bonds, certificates or obligations of any kind, which are by the terms thereof to be redeemed in numerical order or in any arbitrary order of precedence without

reference to the amount previously paid thereon by the holder thereof, whether they are sold on the instalment plan or otherwise."

There is no doubt that these defendants are in the business of issuing and selling obligations which are supposed to have some elements of attraction to purchasers. Leaving out of consideration for the moment the provisions of these contracts which render them worthless as security for the money paid by the purchasers of them, they are undoubtedly represented as likely to be of great advantage to those who buy them early, because the later purchasers will enable the first purchasers speedily to acquire vested interests, on which monthly payments will begin to be made for their benefit, very much larger than they are themselves called upon to make to the association. These payments by the association on account of vested interests purport to be for the purchasers who have acquired these interests, and in that sense purport to be a redemption of the promise contained in the contract. The implication in the contract is that, on the acquisition of a vested interest, property is bought for the holder of the interest, towards the price of which the association makes the payments, or that there is property held by him on which there are incumbrances and that these payments are to be made to relieve his property from the incumbrances. Although the purchaser under a contract is not entitled to possession, it was said at the argument that it was the intention of the association to allow purchasers to have possession as soon as the property is acquired. The word "redeemed" in this statute has reference to performance of their promise by the obligors or contractors whose obligation or undertaking is sold. In that sense the only redemption of the contract sold by these defendants is by the payments which are to be begun for the benefit of each purchaser as soon as a vested interest is acquired, and continued regularly until the stipulated amount is all paid. By the terms of the contract this redemption of the obligations is to be in numerical order, and that is enough to bring it within the statute. Probably the object of this statute is to take away the inducement of chance founded upon the uncertain number of persons who may become purchasers of such obligations, and upon the probable number who may forfeit their rights by non-

payment where payments are to be made on the instalment plan. In schemes involving such uncertainties it will often happen that by reason of their numerical position some parties will obtain large returns, while some, through the failure of others to come in, will lose all that they pay in. Treating the payments to be made by the association on account of vested interests as payments for the benefit of the holders of the vested interests, as the contract purports to treat them, this is a redemption which not only comes within the language of the statute, but which involves all the mischief that the statute was intended to prevent. Moreover, treating it as a performance or redemption by the defendants who issue the obligation, the payments are begun and the redemption is begun and regularly continued when the number is reached in order, without reference to the question whether the purchaser has paid a large or a small sum, if only he has made the payments called for by the contract. The redemption or non-redemption is to depend upon the condition of the home fund, and that will depend, not altogether upon the payments that have been made by the holder who stands next in order for a vested interest, but in large part upon the number of others who have come in, and in part upon the number who have released the association from payments on account of previous vested interests by allowing their contracts to lapse for non-payment. So the redemption comes within the other words of the statute, it is in an " arbitrary order of precedence without reference to the amount previously paid thereon by the holder thereof."

It might be possible to consider redemption to be the turning over of the real estate to the holder of the contract after he makes the full payment of $1,000 upon a $1,000 contract; but in reference to such a contract as this, and especially considering it in reference to the statute before us, it seems to us more proper to treat the redemption as the performance of that which the association professes to do for the benefit of the holder by making payments as soon as he has a vested interest and continuing them regularly until the stipulated sum is paid, a long time before he is required to make them good by his instalments. We have no doubt that the statute was intended to prevent transactions of this character, in which supposed bene-

fits from the order of precedence, in view of obvious contingencies and uncertainties, would be likely to be an inducement to purchasers.

A majority of the court are of opinion that the contracts in the present case come within the prohibition of the statute, and are redeemable when the holders of them, respectively, become entitled to have the payments made upon a vested interest, and that therefore they are redeemable in numerical order, and in an arbitrary order of precedence, without reference to the amount previously paid thereon by the holder thereof.

The defendants being within the prohibition of this statute, the next question is whether the Attorney General can maintain this suit in equity to enjoin them. Clearly there is no statutory authority for this proceeding. The statute directs a forfeiture of $50 for each offence, and declares that a domestic corporation violating the law shall forfeit its franchise, while a foreign corporation shall lose its right to do business in this Commonwealth, and may be enjoined in equity upon the application of the commissioner of corporations. There is much ground for holding that these remedies expressly provided are exclusive of others, but without deciding this, we are of opinion that there is no authority for an information in equity by the Attorney General against individuals acting as copartners in a case of this kind. The several acts sought to be enjoined only affect individual purchasers. No one of them directly affects the public in any way. The only ground for contending that they affect the public is that they may become so numerous as to be of public importance. If a probability of a large number of purchasers would give the Attorney General jurisdiction in a case of this kind, which we do not intimate, the probability is not shown in the present case. It is agreed "that the only evidence from which any inference can be drawn that the business is hazardous to the public, and if continued will work irreparable injury to the Commonwealth," is contained in the contracts themselves. These contracts seem so plainly disadvantageous from every point of view to the purchasers of them, that no intelligent person would be expected ever to pay money on account of one. By no possibility can the purchaser of one of them ever receive under it, according to its terms, nearly so

much as he pays. He can have no title to anything until he has paid in the full amount that has been paid for him, besides all that he has paid for his application and for expenses and contingencies. He can never have any security for his payments as they are being made, except the possibilities of the home fund, and the agreement of the trustees to turn over his real estate when he has fully paid for it. Apparently there are strong probabilities of the loss of everything that he pays. We can see that the scheme might be used as a snare to catch the ignorant and unwary, but we should not expect it to affect very much the interests of the general public.

The right of the Attorney General to proceed by information in equity without special statutory authority exists in two classes of cases, namely, suits to obtain injunctions against public nuisances, and suits to protect public interests under charitable trusts. *Attorney. General* v. *Tudor Ice Co.* 104 Mass. 239, 244. He also may proceed at law in proper cases by *quo warranto* or mandamus. *Attorney General* v. *Donahue*, 169 Mass. 18. *Attorney General* v. *Adonai Shomo Corp.* 167 Mass. 424. *Attorney General* v. *Boston*, 123 Mass. 460. As to whether the Attorney General may proceed in equity as well as at law to prevent certain kinds of unlawful conduct of corporations, the cases differ. See *Attorney General* v. *Utica Ins. Co.* 2 Johns. Ch. 371; *Attorney General* v. *Chicago & Northwestern Railway*, 35 Wis. 425. But we have been referred to no decision in which the Attorney General has been permitted to maintain a suit in equity against individuals to enjoin unlawful transactions with other individuals, like those now before us.

*Information dismissed.*