[No. 6658. Decided October 7, 1907.]

THE STATE OF WASHINGTON, *on the Relation of John D. Atkinson, Attorney General, Respondent,*
v. CO-OPERATIVE HOMEBUILDERS,
*Appellant.*[1]

APPEAL—REVIEW—HARMLESS ERROR. Error in refusing to strike interrogatories intended to disclose the nature of plaintiff's business is harmless where the same sufficiently appeared from other competent evidence.

BUILDING AND LOAN ASSOCIATIONS — WHAT CONSTITUTES — AUTHORITY TO DO BUSINESS. A foreign corporation is not authorized to transact business in this state, without compliance with the statutes relating to building and loan associations, where the general purpose of its business is the creation of a fund by small periodic payments from which loans may be made to those who are otherwise unable to obtain them through inability to give security, on any general plan similar to that of an ordinary building and loan association.

[1]Reported in 91 Pac. 953.

SAME—LOAN TO NONMEMBERS—PENALTY. The fact that loans are to be made to nonmembers does authorize such a corporation to do business in this state without compliance with the building and loan statute, since the statute authorizes loans to nonmembers and no penalty is prescribed for doing business in violation of the statute.

SAME. The fact that such corporations are amenable to the usury laws does not affect their right to do business without compliance with the statute.

Appeal from a judgment of the superior court for King county, Frater, J., entered October 11, 1906, upon findings in favor of the plaintiff, after a hearing on the merits before the court without a jury, enjoining the operations of a foreign corporation within the state. Affirmed.

*Harold Preston* and *F. R. Burch*, for appellant.

*The Attorney General* and *J. B. Alexander, Assistant* (*F. C. Kapp*, of counsel), for respondent.

RUDKIN, J.—This action was instituted by the state, on the relation of the attorney general, to enjoin the defendant from transacting a saving, loan and investment business on the building society plan, within the state, and for other purposes. Judgment was given below according to the prayer of the complaint, and the defendant has appealed therefrom.

A motion was interposed to strike certain interrogatories propounded to the appellant, and the ruling of the court denying this motion is the first error assigned. The appellant contends that the action was instituted to enforce a penalty or forfeiture, and that in such cases a party will not be compelled to make discovery. The principal question in the case was the nature of the business transacted by the appellant in this state, and inasmuch as that sufficiently appeared from other competent evidence, the striking of the interrogatories and the answers thereto would not change the result. We therefore deem it unnecessary to discuss the nature of the proceedings or the ruling of the court on the motion to strike.

It is admitted that the appellant is a foreign corporation, organized and existing under the general laws of the state of California, and that it has not complied with the provisions of the act of March 28, 1890, entitled, "An act relating to building, loan and saving associations doing a general business." Laws 1890, page 56 [Bal. Code, §§ 4395-4433 (P. C. §§ 7128-7166)]. If the appellant is a ·corporation, society, organization or association, doing a saving, loan or investment business on the building society plan, whether neutral or otherwise, and whether issuing certificates of stock which mature at a fixed time or not, as defined by § 22 of the building and loan association act, the judgment should be affirmed, but otherwise it must be reversed. The generally accepted definition of a building and loan association is the following:

"The building association as now existing, is a private corporation, designed for the accumulation by the members of their money by periodical payments into its treasury, to be invested from time to time in loans to the members upon real estate for home purposes, the borrowing members paying interest and a premium as a preference in securing loans over other members, and continuing their fixed periodical installments in addition, all of which payments, together with the non-borrower's payments, including fines for failure to pay such fixed installments, forfeitures for such continued failure of such payments, fees for transferring stock, membership fees required upon the entrance of the members into the society, and such other revenues, go into the common fund until such time as that the installment payments and profits aggregate the face value of all the shares in the association, when the assets, after payment of expenses and losses are prorated among all members, which in legal effect, cancels the borrower's debt, and gives the non-borrower the amount of his stock." Thompson, Building Associations, page 2, § 2.

The nature of the business transacted by the appellant in this state appears from the following provisions of the contract entered into with its patrons or subscribers:

"The California, Oregon & Washington Homebuilders' Association, a corporation of the state of California, party of

the first part, and ———————, party of the second part, agree, the one with the other, and with all others executing similar mutual co-operative contracts, as follows:

"The object of this agreement is the acquisition of a home or farm or the discharge of a mortgage by the holder of this contract, he making small monthly payments and co-operating with others, executing similar contracts and to the same purpose.

"In consideration of the mutual benefits to be derived from the faithful performance of the mutual covenants herein mentioned, by the parties hereto, and the monthly installments to be paid by one to the other, it is agreed by them as follows:

"1st.   The party of the first part shall number, date and register each contract in this series in numerical order as applications for same are received at its home office, and all benefits accruing under this contract shall be in accordance with said numerical order of registration.   Provided, however, the party of the first part reserves the right to consolidate one or more series with this one by interpolating half numbers or maturing the same numbers, or set of numbers, in each series, alternately, thereby augmenting the Home Maturity Fund as well as the numbers.

"2nd.   The party of the second part shall at the signing of his contract have paid thereon as a registration fee, to the party of the first part, the sum of five dollars ($5.00), and shall also pay thereon a further sum of two dollars and fifty cents ($2.50) each month, on or before the 20th day thereof— two dollars ($2.00) of which sum shall be placed to the credit of the second party, in what shall be hereafter known as the Home Maturity Fund, and said sum of two dollars ($2.00) shall be applied on the installment purchases of homes or to the discharge of mortgages according to the co-operative plan aforesaid; and fifty cents (0.50) shall be placed to what is herein termed the Expense Fund, and shall go to the party of the first part for the expenses of said Association.

"3rd.   This contract, if it is the lowest number not then matured, shall be deemed to have matured when, from the continued monthly payments into the Home Maturity Fund on this and like contracts in this series, there shall on the first day of any calendar month have accumulated in the Home Maturity Fund of said Association the sum of seventy-five dollars ($75.00), the Association having discharged all obligations

then due on outstanding matured contracts. As soon as this contract shall have matured, then the holder thereof shall be entitled to an installment sum of seventy-five dollars ($75.00) per month to be applied toward the payment of a home or the discharge of a mortgage for such contract owner, until the sum of one thousand dollars ($1,000.00) shall in this manner be paid, which process shall continue in like manner with each maturing contract. When the sum of one thousand dollars ($1,000.00) shall have been paid for the benefit of the party of the second part, then this contract on the part of the party of the first part shall be performed. When this contract matures as aforesaid, and until the party of the second part shall select and arrange for the purchase of real estate, or to build a house or to discharge a mortgage on a lot, owned by him, the said sum of seventy-five dollars ($75.00) per month shall be kept and accumulated by the party of the first part, and paid out only on a home or mortgage for the said party of the second part.

"4th. Upon the maturity of this contract, and annually thereafter, the party of the second part shall pay to the party of the first part, the sum of six dollars ($6.00) over and above all other payments herein provided for, which shall go into what shall be hereafter known as the Equalization Fund.

"5th. The said party of the second part shall obtain a complete abstract of title to the property to be purchased, or upon which a building is to be erected or a mortgage is to be discharged, to be examined by the party of the first part, at the expense of the party of the second part, and if the property, title and contract of purchase be approved by the party of the first part and the same be ordered purchased by the party of the second part, or the mortgage discharged, the contract of purchase or conveyance shall be made by the party of the first part with the owner of the property, and the party of the first part shall pay on said contract of purchase or conveyance or mortgage for the benefit of said party of the second part the sum of seventy-five dollars ($75.00) per month, as aforesaid, and the party of the second part shall execute a deed of trust or mortgage or a contract giving the party of the first part, or someone they may designate, a lien on said land in such way and kind as the attorney of the party of the first part may determine to be necessary; and, upon maturity of this contract, the party of the second part

shall pay to the party of the first part on or before the 20th day of each month, an additional sum of two dollars and fifty cents ($2.50) a month over and above the two dollars and fifty cents ($2.50) heretofore provided for; or the sum of five dollars ($5.00); fifty cents. ($0.50) of which sum shall be paid to said party of the first part for the expense of conducting its business, and the sum of four dollars and fifty cents ($4.50) shall be placed to the credit of the party of the second part in the Home Maturity Fund aforesaid, and shall go to pay off obligations of the party of the first part, for homes purchased or mortgages discharged, by the provisions of this and similar contracts.

"6th. When the monthly payments of four dollars and fifty cents ($4.50) into the Home Maturity Fund shall aggregate the sum of one thousand dollars ($1,000.00), less the amount the second party has to his credit in the Home Maturity Fund before maturity, and all other conditions of this contract shall have been complied with, then the first party shall convey to said second party, or contract holder, all its interest in said property.

"7th. This contract may be assigned, upon payment of two dollars ($2.00) to said first party, the consent of said first party having first been obtained in writing."

From the foregoing provisions it is quite apparent that the general purpose of the appellant and the ordinary building and loan association is identical, viz., the creation of a fund by small periodic payments from which loans may be made to those who are otherwise unable to obtain them, because of their inability to give security. Building associations exist in one form or another in nearly all the states. In some they are organized under general incorporation laws, in others there are a few general statutory provisions in reference to them, while in still others the statutes contain elaborate provisions relating to their formation and the conduct of their business. For these reasons, while the general plan and purpose of all such associations is the same, their methods of transacting business are by no means uniform. Thus, some loan to members only, others to non-members; some loan for a specific pur-

pose, others for any purpose; some loan to the highest bidder at auction, others at a fixed premium; in some the stock matures at a fixed time in advance, others contra; some are on the terminating plan, while others are permanent, and diverse other features we need not mention.

If the general plan and purpose of the appellant is similar to that of the ordinary building and loan association, why does it not fall within the definition of our statute. One reason assigned is that the persons with whom these contracts are entered into and to whom loans are made are not members of the corporation or association. In support of this view *Attorney General v. Pitcher*, 183 Mass. 513, 67 N. E. 606, is cited. It was there held that a statute forbidding any person, association or corporation, except certain licensed ones, to transact the business of accumulating the savings of its members and loaning to them such accumulations, in the manner of a cooperative bank, unless incorporated within the commonwealth for that purpose, was not violated by a corporation whose *modus operandi* was much the same as that of the appellant. Two reasons were assigned for the decision; first, because the statute was penal and should be strictly construed; and second, because "the purchasers of these contracts are not members of the association, and their savings are not savings of members but of holders of individual contracts from the association. They have no voice in the management of the affairs of the association. No money of members of the association is lent to any of its members. The savings of these contractors are not accumulated and lent to them in the manner of a cooperative bank, but the course of dealing is very different from that of any bank." The court added significantly, however, "It may well be said that all the reasons for the enactment of this statute apply with great force to an association transacting business like that of these defendants."

16—47 WASH.

We do not consider this case controlling for two reasons: First, the Massachusetts statute imposed a penalty of not more than $1,000 for its violation, and the rule of strict construction obtained, while our statute imposes no penalty on the corporation itself, and this court has uniformly given a liberal construction, in favor of the public, to statutes relating to the formation of domestic corporations, or to the right of foreign corporations to transact business within the state. *State ex rel. Osborne, Tremper & Co. v. Nichols*, 38 Wash. 309, 80 Pac. 462; *State ex rel. Gorman v. Nichols*, 40 Wash. 437, 82 Pac. 741; *State ex rel. Amalgamated Republic Mines Co. v. Nichols*, ante p. 117, 91 Pac. 632. Second, our statute permits building and loan associations to loan to non-members. Laws 1903, p. 219, § 5.

Another line of cases arising under the usury law is relied on. Our statute provides that "No premium taken for loans, nor amounts charged for expenses, as allowed in this act nor any payments on account of installments of stock made by a borrowing member shall be considered as a repayment on his loan, or shall render such association amenable to the laws relating to usury." Laws 1903, p. 219, § 4; and other states have similar enactments. It has frequently been held under such statutes that associations transacting a business similar to that of appellant are not exempt from usury laws. The reason for the rule is thus stated in *Skinner v. Southern Home Building & Loan Ass'n*, 46 Fla. 547, 35 South. 67:

"By the use of the term 'building society plan' the legislature must have had reference to some definite plan, and not to whatever scheme under a like name might be devised in the various states or foreign countries; and hence it is not improper to assume the legislators, in the use of such term, must have had in mind the plan with which they were familiar —that is, the auction plan."

In a similar case the supreme court of Illinois said:

"It has been well said by the supreme court of Maryland 'that every device and shift which the wit of man could sug-

gest have been invoked to exempt contracts for illegal interest from the operation of the law, but courts should look under the mask to discover the true nature of the real transaction.' " *Rhodes v. Missouri Savings & Loan Co.*, 173 Ill. 621, 50 N. E. 998.

We think a different rule should obtain in this class of cases. Our legislature no doubt had in mind the schemes and devices that might be resorted to by associations from other states and from foreign countries to evade our laws, and doubtless intended that the general and comprehensive definition given should apply to and exclude all such associations from our borders. It is the duty of the court to look at the substance rather than the mere form, and we are convinced that public policy and our statute fairly construed demand that the appellant should comply with our laws or cease operations here.

There is no error in the record, and the judgment is affirmed.

HADLEY, C. J., FULLERTON, CROW, DUNBAR, and ROOT, JJ., concur.